

FILED
MARCH 5, 2026
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JUDY CUNDY, an individual, | ) | No. 40095-6-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BNSF RAILWAY COMPANY, f/k/a | ) | |
| BURLINGTON NORTHERN AND | ) | UNPUBLISHED OPINION |
| SANTA FE RAILWAY COMPANY, a | ) | |
| corporation, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| DOES 1 through 100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

MURPHY, J. — Judy Cundy (Cundy) appeals from a trial court order: (1) striking the opinion of her expert witness, Robert Gale, M.D., Ph.D. (Dr. Gale), that diesel exhaust exposure was the cause of Cundy's colon cancer, and (2) granting partial summary judgment to BNSF Railway Company (BNSF) on this claim.

Cundy worked for BNSF for more than two decades. In 2019, she was diagnosed with a rare subtype of colorectal cancer. She filed a lawsuit under the federal Employers'

Liability Act (FELA), 45 U.S.C. §§ 51-60, alleging long-term occupational exposure to diesel engine exhaust was a cause of her cancer.[1]

The trial court struck Dr. Gale's opinion under both the *Frye*[2] standard and ER 702. Cundy contends the trial court erred by applying the *Frye* standard and by failing to consider the mutagenic properties of diesel exhaust in its analysis. BNSF's position is that (1) Cundy failed to preserve the error, (2) the exclusion of Dr. Gale's opinion was proper under both *Frye* and ER 702, and (3) FELA's causation standard does not govern evidentiary admissibility.

We hold (1) the *Frye* standard does not apply because the methodologies used by Dr. Gale are long-accepted and not novel, (2) nevertheless, the trial court acted within its discretion when it excluded Dr. Gale's opinion under ER 702 as Dr. Gale's application of accepted methodologies was demonstrably unreliable, (3) FELA's relaxed substantive causation standard does not lower Washington's evidentiary gatekeeping requirements for expert testimony, and (4) with no admissible causation evidence, summary judgment was proper. Accordingly, we affirm.

---

[1] By the time of the summary judgment hearing, Cundy had voluntarily withdrawn an opinion that asbestos exposure was an additional cause of Cundy's cancer

[2] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923)

BACKGROUND

Cundy worked for BNSF as a switchman and radio control operator beginning in August 1996. In January 2019, Cundy was diagnosed with "[m]alignant neoplasm of cecum, T4bN1a post right hemicolectomy" after it was discovered during surgery that she had "colon cancer, signet ring cell type, T4bN1a, with 3/24 nodes positive." Clerk's Papers (CP) at 51. Two years later, Cundy initiated a negligence action under FELA in Spokane County Superior Court against BNSF, alleging that workplace exposure to toxic substances and carcinogens, including diesel exhaust fumes, was the cause of her cancer.

Cundy retained Dr. Gale, a medical doctor and scientist, as an expert witness "specializing in cancer biology and therapy" with a "PhD [] in microbiology and immunology with a focus on experimental cancer models." CP at 74. In his written report, Dr. Gale opined that it was "more likely than not Ms. Judy Cundy's occupational exposures to diesel engine exhaust, formaldehyde (a constituent of diesel engine exhaust) and asbestos were causes of her colo-rectal cancer." CP at 79.

BNSF asked the trial court to strike Dr. Gale's opinion that diesel exhaust exposure caused Cundy's colon cancer, arguing that "Dr. Gale failed to adhere to a reliable methodology and his opinions thus lack any adequate foundation." CP at 121.

Dr. Gale was the only expert to offer a causation opinion related to diesel exhaust exposure.

Cundy argued that "FELA's relaxed standard of causation also relaxes the threshold of admissibility for the reception of expert testimony." CP at 59. She went on that state that "Dr. Gale not only demonstrates a causal relationship between diesel exhaust and colon cancer but also employs a reliable methodology based on sufficient facts and data in forming his conclusions, as evidenced in his 23-page expert report and more fully supported in his 7-hour deposition." CP at 59.

*Hearing and trial court ruling*

After the trial court heard oral argument from counsel for the parties, and made its oral ruling, Cundy's counsel requested that the court hold a *Frye* evidentiary hearing to hear directly from Dr. Gale and assess his opinion prior to issuance of a written decision. The court indicated it would delay issuing a written decision for one week to allow counsel to file a *Frye* motion and note it for hearing. When no motion was filed, the court entered its order on summary judgment.

The trial court noted in its summary judgment order that "'*Frye* and ER 702 work together to regulate expert testimony: *Frye* excludes testimony based on novel scientific methodology until a scientific consensus decides the methodology is reliable; ER 702

excludes testimony where the expert fails to adhere to that reliable methodology.'" CP at 152 (quoting *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918-19, 296 P.3d 860 (2013)). The court ultimately concluded Dr. Gale's opinions failed under both *Frye* and ER 702 and struck the opinions. Because Dr. Gale was Cundy's only causation witness, the trial court granted summary judgment dismissing Cundy's claim that exposure to diesel exhaust was a cause of her cancer. The court later granted BNSF's motion for attorney fees and costs and entered a final judgment after Cundy agreed to dismiss her remaining claims.

Cundy timely appeals from the court's final orders.

## ANALYSIS

We review de novo a trial court's decision under *Frye* to admit or exclude evidence. *State v. Baity*, 140 Wn.2d 1, 9, 991 P.2d 1151 (2000). "If the *Frye* test is satisfied, the trial court must then determine whether expert testimony should be admitted under the two-part test of ER 702, i.e., whether the expert qualifies as an expert, and whether the expert's testimony would be helpful to the trial of fact." *State v. Copeland*, 130 Wn.2d 244, 256, 922 P.2d 1304 (1996). A trial court's ER 702 decision is reviewed for abuse of discretion. *L.M. v. Hamilton*, 193 Wn.2d 113, 134, 436 P.3d 803 (2019).

No. 40095-6-III
*Cundy v. BNSF Ry. Co.*

We review de novo a trial court's summary judgment determination. *Strauss v. Premera Blue Cross*, 194 Wn.2d 296, 300, 449 P.3d 640 (2019).[3]

As a threshold matter, BNSF argues Cundy waived her right to appeal the trial court's ruling to exclude Dr. Gale's expert opinions by failing to schedule a *Frye*

---

[3] Contrary to arguments raised in dissent, the abuse of discretion standard applies to the ER 702 reliability determination in the summary judgment context. While summary judgment decisions are reviewed de novo, evidentiary gatekeeping under ER 702 remains discretionary. In *Lakey*, a CR 12(b)(6) motion to dismiss was later converted to a summary judgment motion after the trial court considered matters outside the pleadings. 176 Wn.2d at 921-22. Before proceeding to summary judgment, the trial court excluded some expert testimony under ER 702 as unreliable, and our Supreme Court declined to disturb this discretionary decision as "[t]he trial court did not act in a manifestly unreasonable manner in excluding [the] testimony." *Id*. at 920-21. Our Supreme Court explicitly stated, "We review a trial court's decision concerning the admissibility of expert testimony for an abuse of discretion." *Id*. at 919. De novo review of a summary judgment does not supplant this; it ensures our review for any genuine issues of material fact remains *after* resolving the admissibility of ER 702 evidence. The Supreme Court decisions in *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 393 P.3d 776 (2017), and *Folsom v. Burger King*, 135 Wn.2d 658, 958 P.2d 301 (1998), do not hold that review of a trial court's decision under ER 702 to exclude evidence is reviewed de novo. In *Frausto*, our Supreme Court noted it was "not clear that the trial court even attempted to exercise its discretion in resolving an evidentiary issue, believing instead that our case law foreclosed the possibility of [the expert]'s testimony on proximate cause." 188 Wn.2d at 231, 242. In *Folsom*, the Supreme Court considered all evidence submitted in relation to the summary judgment proceedings, including "evidence that had been redacted" from an expert witness's affidavits "relating to duty of care or the standard of care." 135 Wn.2d at 662-64. Similar to *Frausto*, we would have to engage in speculation as to whether the trial court in *Folsom* exercised a discretionary evidentiary decision under ER 702.

6

No. 40095-6-III
*Cundy v. BNSF Ry. Co.*

evidentiary hearing.[4] We disagree.

Failure to raise an issue before the trial court generally precludes appellate review

unless it constitutes manifest constitutional error. RAP 2.5(a); *State v. Robinson*, 171

Wn.2d 292, 304, 253 P.3d 84 (2011).

While Cundy did not file a motion for a *Frye* evidentiary hearing or schedule a

hearing, the parties presented briefing and gave oral argument on the question of whether

Dr. Gale's testimony was admissible under *Frye*. Moreover, the trial court's order

specifically cited *Frye* as a basis for excluding the evidence. Cundy's failure to pursue an

additional evidentiary hearing does not forfeit review of the rulings actually made.

*See L.M.*, 193 Wn.2d at 128 n.13. The issue was preserved for appeal.

1.      *Frye*

Washington long ago adopted the *Frye* test as the standard for admission of novel

---

[4] BNSF also argues Cundy put forward an "unverified . . . [and] unsworn report" of Dr. Gale that was "not signed under the penalty of perjury." Br. of Resp't at 4 (citing RCW 5.50.050). Contrary to BNSF's argument, an objection on this basis to Dr. Gale's report was not made or developed at the trial court level. Both parties submitted the report of Dr. Gale as part of their written materials and referenced the report in argument. All of this occurred without objection to the manner in which the report was signed. The trial court specifically noted in its order that "the expert witness disclosure of Plaintiff's expert Dr. Robert Gale, M.D., PhD. dated January 12, 2023 as well as the multiple depositions of Dr. Gale taken in this matter have been reviewed." CP at 150. This issue has not been preserved for appeal.

scientific evidence. *State v. Cannon*, 130 Wn.2d 313, 325, 922 P.2d 1293 (1996);

*Copeland*, 130 Wn.2d at 251, 255-56.

To be admissible at trial, expert testimony involving novel scientific evidence

must satisfy both *Frye* and ER 702. *Copeland*, 130 Wn.2d at 255-56. The *Frye* test

involves assessing whether this novel evidence "has a valid scientific basis." *Reese v.*

*Stroh*, 128 Wn.2d 300, 306, 907 P.2d 282 (1995). "*Frye* is implicated only where 'either

the theory and technique or method of arriving at the data relied upon is so novel that it is

not generally accepted by the relevant scientific community.'" *Lakey*, 176 Wn.2d at 919

(quoting *Anderson v. Akzo Novel Coatings, Inc.*, 172 Wn.2d 593, 611, 260 P.3d 857

(2011)). When the evidence does not involve new methods of proof or new scientific

principles, there is no need to subject it to a *Frye* test. *State v. Pigott*, 181 Wn. App. 247,

249, 325 P.3d 247 (2014). Likewise, "the application of accepted [scientific] techniques

to reach novel conclusions does not raise *Frye* concerns." *Lakey*, 176 Wn.2d at 919.

Here, Dr. Gale conducted a review of scientific literature, epidemiological studies,

and data related to the carcinogenic effects of diesel particulate matter. Literature review,

weight-of-the-evidence synthesis, Bradford Hill criteria,[5] and differential diagnosis are

---

[5] "Bradford Hill" is a "'methodology of determining causation . . . characteristically used in medical cases' that involves analyzing nine criteria." *Desranleau*, 26 Wn. App. 2d at 428 (alteration in original).

accepted in the scientific community. *State v. Greene*, 139 Wn.2d 64, 72, 984 P.2d 1024

(1999) (literature review); *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 428, 527

P.3d 1160 (2023) (Bradford Hill criteria); *In Re Pers. Restraint of Morris*, 189 Wn. App.

484, 494-95, 355 P.3d 355 (2015) (differential diagnosis). The dispute here is not

whether those tools were valid in the abstract. Rather, the dispute is whether Dr. Gale

reliably applied those tools to the question of whether diesel exhaust causes colorectal

cancer and specifically caused Cundy's colorectal cancer. The dispute, therefore, entails

an ER 702 reliability inquiry, not a *Frye* inquiry. The trial court erred in excluding

Dr. Gale's testimony under *Frye*.

2.    *ER 702*

The admissibility of expert testimony in Washington is generally governed by

ER 702:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience, training,
> or education, may testify thereto in the form of an opinion or otherwise.

Testimony deemed helpful to the trier of fact under ER 702 must also be

reliable—it may not rest on speculation or subjective belief. *See Reese*, 128 Wn.2d at

307-09. "Unreliable testimony does not assist the trier of fact." *Lakey*, 176 Wn.2d at 918.

"[C]onclusory or speculative expert opinions lacking an adequate foundation will not be

admitted." *Safeco Ins. Co. of Am. v. McGrath*, 63 Wn. App. 170, 177, 817 P.2d 861

(1991). "If there is a concern that expert testimony is 'somewhat speculative,' the court

should consider any danger that the jury may be overly impressed with a witness

possessing the 'aura of an expert.'" *Asphy v. State*, 31 Wn. App. 2d 605, 623, 552 P.3d

325 (2024) (quoting *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010)),

*review denied*, 3 Wn.3d 1033, 559 P.3d 1023 (2024)).

Here, the trial court found Dr. Gale's expert opinion unreliable and that it failed to

adhere to a reliable methodology. We agree.

### 2.1    Misrepresentation of authoritative sources

Dr. Gale misrepresented authoritative sources in his report. He quoted from

IARC (International Agency for Research on Cancer) Monograph 105,[6] stating that

---

[6] "The IARC Monographs Program identifies environmental factors that can increase the risk of human cancer. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and personal habits. An IARC Monograph is not 'a new study' but the comprehensive and critical review and evaluation of the published scientific evidence on the carcinogenicity of human exposures; this includes data on cancer in humans, cancer bioassays and data on the mechanisms of carcinogenesis. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens." INT'L AGENCY FOR RSCH. ON CANCER, WORLD HEALTH ORG., IARC MONOGRAPHS ON THE IDENTIFICATION OF CARCINOGENIC HAZARDS TO HUMANS, VOL. 105: DIESEL AND GASOLINE ENGINE EXHAUSTS AND SOME NITROARENES 1 (June 2012), https://www.iarc.who.int/wp-content/uploads/2018/07/BackgrounderMono-105-1.pdf.

"[s]ome case-control studies of cancers of the larynx and colon suggested a positive association with exposure to engine exhaust." CP at 132-33.

IARC Monograph 105 discusses an association between diesel exhaust and *lung cancer* and *urinary bladder cancers*, based on a review of studies described in detail in the Monograph, but does not include colon cancer. While the Monograph briefly addressed colon cancer in a subsection of the Monograph, it did not identify or describe in any detail the studies reviewed. CP at 132-33. Dr. Gale quoted from only the emphasized portion below in the "Cancer at other sites" subsection of IARC Monograph 105:

> Twenty-five case control studies of adult cancers at sites other than the lung or urinary bladder were reviewed with regard to potential associations with exposure to diesel or gasoline engine exhausts. For most cancer sites in adults, only a small set of studies was available, the majority of which were limited with regard to exposure assessment, the number of exposed cases and other methodological problems. Occupational cohort studies showed no consistent patterns for other sites based on external comparisons and could not address potential confounders. *Some case-control studies of cancers of the larynx and colon suggested a positive association with exposure to engine exhaust* (unspecified mixtures of diesel and gasoline) or proxies of exposure; however, these were not consistently supported by results from cohort studies. For pancreatic cancer, prostate cancer, multiple myeloma. leukaemia and lymphoma, the overall evidence did not support an effect of exposure to diesel and/or gasoline engine exhausts.

CP at 132-33 (emphasis added). Dr. Gale's selective quotation from this subsection was a material misrepresentation of the information in Monograph 105.

11

### 2.2    Cherry-picking and failure to grapple with contrary studies

Of approximately 16 epidemiologic studies that examined diesel exhaust exposure and colorectal cancer, only one suggested an association (and that at a relaxed confidence interval). Dr. Gale did not "mention the negative studies, let alone explain why they are less compelling than the studies he believes support his opinions." CP at 154. This selective engagement violates the weight-of-the evidence approach, which requires synthesizing all relevant data, not just supportive fragments.

### 2.3    Analytic gap in site-specific extrapolation

All authoritative bodies classify diesel exhaust as carcinogenic to humans based, primarily, on lung cancer, with weaker evidence for bladder cancer, and insufficient evidence for all other sites. Dr. Gale nevertheless extrapolated lung-cancer potency factors to colorectal cancer solely because diesel exhaust contains mutagenic compounds. He cited no animal, mechanistic, or human data supporting site-specific causation for colorectal cancer.

While we acknowledge the mutagenic properties of diesel exhaust and the science of multi-step carcinogenesis—where toxins can damage DNA across cell types—this does not bridge the analytic gap. General mutagenicity does not equate to site-specific causation without supporting data. Dr. Gale's extrapolation rests on assumption, not

reliable application of Bradford Hill criteria or weight-of-evidence synthesis. The trial

court properly identified this as a foundational flaw.

### 2.4    Unsupported dismissal of smoking

Dr. Gale opined that cigarette smoking—a well-established cause of colorectal

cancer—is irrelevant to signet-ring-cell cancer cases. He cited no literature for this

proposition. When pressed at his deposition, he could not identify any study supporting

this conclusion. This failure to apply differential diagnosis systematically—ruling out

alternatives without evidence—renders his specific causation opinion unreliable.

### 2.5    Failure to perform promised methodologies

Dr. Gale repeatedly stated he employed Bayesian reasoning and differential

diagnosis, yet performed no calculations, assigned no probabilities, and provided no

quantitative bridge from general to specific causation.

Cundy's arguments that the trial court did not consider the carcinogenic effects of

diesel exhaust on DNA, even if true, do not change the fact that Dr. Gale did not adhere

to a reliable methodology or lay the proper foundation for the conclusions he reached.

The trial court identified multiple, independently sufficient grounds to establish

unreliability. Because Dr. Gale failed to adhere to a reliable methodology, and his

13

opinions lack adequate foundation, the trial court did not abuse its discretion in excluding

Dr. Gale's testimony under ER 702.

This gatekeeping by the trial court is not "weighing evidence." Rather, it is a

threshold reliability assessment mandated by ER 702. *Lakey*, 176 Wn.2d at 918-19. Dr.

Gale's qualifications do not cure the flaws in how he arrived at his conclusions. His

qualifications satisfy only the first prong of ER 702. The question of reliability is a

separate inquiry. Here, colorectal evidence is insufficient per IARC Monograph 105,

and Dr. Gale's application flaws are substantial and severe.

### 3. *FELA's relaxed causation standard does not relax evidentiary reliability requirements*

Cundy argues the trial court failed to take into account FELA's relaxed causation

standards, thereby committing reversible error. BNSF argues the relaxed causation

standard under FELA does not affect the admission of expert witness testimony. State

evidentiary rules, including ER 702, apply in state court FELA actions. *See Consol. Rail

Corp. v. Gottshall*, 512 U.S. 532, 541-42, 114 S. Ct. 2396, 129 L.Ed.2d 427 (1994)

(acknowledging the guiding role of common law for FELA claims); *Eubanks v. CSX

Transp., Inc.*, 223 Ga. App. 616, 478 S.E.2d 387, 390 (1996) ("Although federal law

controls substantive matters in a FELA case, in the absence of any interference with

substantive rights or defenses under FELA, state rules of procedure and practice

(including rules governing the admissibility of evidence) apply.").

This case was brought under FELA in Spokane County Superior Court. State

courts apply state procedural rules in cases brought under FELA, but FELA applies to

substantive issues, including causation. *See* 45 U.S.C. § 51; *Hardyman v. Norfolk & W.*

*Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001). The admission of expert testimony is

controlled by rules of evidence and *Frye*. *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d

1343, 1352 (M.D. Ga. 2007), *aff'd,* 300 Fed. Appx. 700 (11th Cir. 2008).

Here, Cundy fails to cite any authority that has applied FELA's relaxed causation

standard to the admissibility of expert testimony. While the standard of proof may be

lowered to determine negligence, the standards of quality and reliability of the evidence

relied upon, under the rules of evidence, have not been relaxed. The FELA relaxed

standard on causation does not apply to the admissibility of expert testimony.

The trial court properly excluded Dr. Gale's causation opinions under ER 702.

## CONCLUSION

The trial court erred in excluding Dr. Gale's expert opinion under *Frye*, but not

under ER 702. The relaxed standard on causation under FELA does not apply to the

admissibility of expert testimony. Because no admissible causation evidence remained

No. 40095-6-III
*Cundy v. BNSF Ry. Co.*

after exclusion of Dr. Gale's opinions, the trial court properly granted summary judgment

to BNSF.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Murphy, J.

I CONCUR:

_____
Staab, A.C.J.

16

No. 40095-6-III

FEARING, J.P.T.[†]—

In cases brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, a summary judgment for defendants is justified only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of the employee. *Pehowic v. Erie Lackawanna Railroad*, 430 F.2d 697, 699-700 (3d Cir.1970).

Judy Cundy's appeal prods a fascinating review of how science searches for and identifies causes of cancers. The appeal asks whether the trial court erred, when entertaining the summary judgment motion of BNSF Railway Company, formerly known as Burlington Northern and Santa Fe Railway Company (BNSF), by striking the opinion of Dr. Robert Peter Gale that exposure to diesel engine exhaust was a cause of Cundy's colorectal cancer. The evidentiary ruling directly led to the grant of summary judgment dismissing Cundy's suit.

When reviewing this appeal's controlling knotty question, the majority ignores two fundamental legal principles, inevitably resulting in an erroneous judgment. First, the majority assumes that this court, when reviewing an evidentiary ruling attended to a summary judgment motion, applies an abuse of discretion standard of review instead of the compulsory de novo standard. Second, the majority, as did the superior court, weighs the evidence contrary to the authority of an appellate court or the superior court when reviewing a summary judgment motion. In affirming the trial court, the majority also ignores the science of cancer whereby one toxin can destroy the inside of various human cells regardless of the location in the body of those cells.

---

[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

Dr. Peter Gale's opinion on causation merits unremitting cross-examination. Nevertheless, I conclude that renowned expert witness Dr. Gale presented an admissible opinion that Judy Cundy's exposure to diesel engine exhaust was a cause of her colorectal cancer for which she sues her employer, BNSF. Thus, I would reverse the summary judgment dismissal of Cundy's suit.

A summary judgment motion requires the trial court to review all evidence presented by the parties. In turn, our review of a summary judgment order demands we consider and analyze that same evidence. In an appeal involving a battle of experts about causation of a disease, that evidence tends to extend indefinitely. To properly identify the evidence that exists to defeat BNSF's summary judgment motion and to suitably analyze the evidence in the difficult arena of the reliability of expert opinions, this decision also extends indefinitely.

UNDERLYING FACTS

Judy Cundy toiled for BNSF for twenty-five years from 1996 to 2021. "She worked as a Switch Foreman, Utility Worker, Conductor, and Brakeman." Clerk's Papers (CP) at 83. Cundy's work exposed her to diesel engine exhaust. A constituent component of the exhaust is formaldehyde.

Some evidence states that Judy Cundy smoked 28 packs of cigarettes a year. Other parts of the record declare that Cundy smoked 12 packs per year.

In 2018, a physician diagnosed Judy Cundy with a rare form of colorectal cancer, "T4b, N1a M0 signet ring type adenocarcinoma of the cecum classified as Stage-3B."

CP at 83. The cecum is a pouch within the peritoneum and considered to be the beginning of the large intestine. Adenocarcinoma is a type of cancer made of cells from glands. Cecal cancer is a form of colorectal cancer. Signet ring cell carcinoma (SRCC) is a rare and aggressive subtype of adenocarcinoma characterized by the presence of signet ring-shaped cells. SRCC is distinguished by its unique cellular morphology, where cells appear round with a large vacuole that pushes the cell nucleus to one side, resembling a signet ring. SRCC generally develops in the stomach, but can on rare occasions appear in the breast, colon, pancreas, or gallbladder. As an aggressive cancer, SRCC metastasizes early, complicating early detection.

Stage 3 colon cancer means the tumor has spread beyond the lining of the colon to nearby lymph nodes. Although the lymph nodes will contain cancer cells, the disease will not yet have spread to distant organs in the body, such as the liver or lungs. In the context of colon cancer, T4b indicates the cancer has attached to or grown into nearby tissues or organs. In the context of colon cancer, N1a refers to the presence of cancer cells in one regional lymph node.

When Judy Cundy filed her lawsuit in December 2021, she alleged that both diesel engine exhaust and asbestos contributed to her contracting colorectal cancer. According to Cundy, her work at BNSF exposed her to asbestos embedded in train brakes. During discovery, Cundy withdrew her allegation that asbestos was a cause of her cancer.

DR. PETER GALE

I now focus on the expert opinions of Dr. Peter Gale and the challenge by BNSF to those opinions. I glean this information from a report prepared by Dr. Gale, a deposition of Dr. Gale, and declarations from BNSF's experts. Dr. Gale opines that a causal link existed between Judy Cundy's colorectal cancer and her occupational exposure to diesel engine exhaust. BNSF denies that diesel engine exhaust causes colorectal cancer, or the railroad at least posits that no studies or other evidence support a conclusion of a causal relationship between the two.

Dr. Robert Peter Gale received a medical doctor degree from the University of Buffalo in 1970 and a PhD in microbiology and immunology from the University of California at Los Angeles in 1976. He specializes in cancer biology and therapy. For fifty years, Dr. Gale has engaged in study and research in oncology and performed clinical research in how cancers develop. From 1973 to 1993, Dr. Gale taught at the UCLA School of Medicine Division of Hematology and Oncology. He was a Bogart Fellow and Scholar at the Leukemia Society of America. Dr. Gale has published more than 1250 scientific articles. He has written more than twenty books on leukemia, transplantation, cancer biology, immunology, and radiation biology. He wrote articles on nuclear weapons and nuclear energy for the *New York Times*, the *Los Angeles Times*, the *Washington Post*, *USA Today*, and the *Wall Street Journal*. Dr. Peter Gale's list of positions with cancer organizations, medical boards, awards, honors, and accomplishments through experimentation and research on cancer fills pages and pages.

Dr. Peter Gale and collaborators developed the use of haematopoietic cell transplants to treat various forms of cancers. Dr. Gale and colleagues identified the molecular basis of chronic myelogenous leukemia. His research has advanced knowledge of the compelling subject of the formation of cancers. Foreign governments have engaged the services of Dr. Gale to assist in nuclear emergencies and radiation disasters such as the 1986 Chernobyl nuclear power station accident and the 2011 Fukushima major nuclear accident.

Judy Cundy hired Dr. Peter Gale to render opinions relating to whether occupational exposures to diesel engine exhaust, and in particular formaldehyde, a constituent part of diesel exhaust, more likely than not, based on reasonably medical probability, was a cause of her colorectal cancer. Dr. Gale answered the questions in the affirmative. BNSF experts agree that Judy Cundy contracted colorectal cancer. They disagree that diesel fuel or formaldehyde is carcinogenic.

Dr. Peter Gale posed three questions to himself when investigating the cause of Judy Cundy's colorectal cancer. First, does exposure to diesel engine exhaust cause cancer in humans? Second, does exposure to diesel engine exhaust cause colorectal cancer? Third, did Cundy's exposure to diesel exhaust cause her colorectal cancer?

When forming his opinion as to the cause or causes of Judy Cundy's cancer, Dr. Peter Gale claims he employed the weight-of-the-evidence approach found in sources such as the:

> Reference Manual on Scientific Evidence (2nd Ed.; Federal Judicial Center; 2000); (2) Guidelines for Cancer Risk Assessment (US

Environmental Protection Agency; 2005); (3) Risk Assessment in the Federal Government: Managing the Process (National Research Council; National Academy of Science; 1983; (4) Science and Judgment in Risk Assessment (National Research Council; National Academy of Science (1994); (5) 15th Report on Carcinogens (National Toxicology Program [NIP]; US Department of Health and Human Services; 2022); and (6) International Agency for Research in Cancer (IARC; World Health Organization; Monograph 75s on the Evaluation of Carcinogenic Risks to Humans, Supplement 7, Overall Evaluations of Carcinogenicity 1987).

CP at 64 (quoting Gale Report p.p. 6).

The weight-of-evidence approach builds on but extends and improves the *Hill viewpoints*. In 1965, Sir Bradford Hill, a member of the Royal Society of Medicine, to which Dr. Gale belongs, developed the *Hill viewpoints* as a means of identifying causes of medical maladies. Hill listed nine factors to consider when forming an opinion of general causation of diseases: (1) strength of an association; (2) consistency; (3) specificity; (4) temporality; (5) biological gradient; (6) plausibility; (7) coherence; (8) experiment; and (9) analogy.

Hill added:

> None of my nine viewpoints can bring indisputable evidence for or against the cause—and—effect hypothesis and none can be required as a sine qua non. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question—is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?

CP at 80.

One must distinguish between general causation and specific causation in the medical field. General causation addresses whether an activity or object may cause a particular disease. Specific causation goes further and determines whether an activity or

6

object caused the disease in a discrete individual. Judy Cundy's appeal asks both whether diesel engine exhaust can cause cancer or colorectal cancer in general and whether diesel engine exhaust caused Cundy's colorectal cancer. The *Hill viewpoints* focus only on general causation.

In the sixty years since Sir Bradford Hill developed his viewpoints, science has purportedly advanced in its ability to determine causation of diseases. Medical science now holds detailed data at the molecular level of how mutagens and carcinogens cause or contribute to cancer development. According to Dr. Peter Gale, cancer develops, in most instances, through a multi-step process whereby mutations accumulate in the genetic material or DNA of a cell. The literature labels this process as multi-step carcinogenesis. Rarely does one agent by itself cause a cancer. Exposure to several carcinogens, each causing one or more mutations, likely underlies a cancer's development in a human.

A weight-of-evidence analysis synthesizes lines of evidence, possibly of varying quality, to determine the degree of support for an opinion. The analysis employs several stages: (1) determining the appropriate focus based on the objectives and preliminary consideration of available data, (2) formulating the question(s) to be assessed and developing an approach, (3) establishing lines of evidence including identifying and selecting studies, (4) assessing the quality of the studies and analyzing a set of studies of similar type; (5) integrating data from available lines of evidence to determine the degree of support for an opinion; and (6) a synthesis of the weight-of-evidence in a form that maximally supports a scientific medical conclusion.

A weight-of-evidence analysis can be qualitative rather than quantitative. For example, the Organization for Economic Co-operation and Development (OCED) defines weight-of-evidence as: "a comprehensive, integrated, often qualitative judgment of the extent and quality of information supporting a hypothesis for which the approaches and tools vary, depending on the context." CP at 80-81. The scientist reviews each set of evidence to determine its quality based on relevance, validity, and reliability. In turn, the scientist labels a set of evidence as "high, medium, or low" as to its relevance, validity and reliability. CP at 81. Based on expert judgement, the scientist may then assess the overall importance of each set of evidence.

The weight-of-evidence methodology has added elements beyond the *Hill viewpoints* to increase its scientific validity in the field of cancer. As summarized in the United States Environmental Protection Agency Guidelines for Carcinogen Risk Assessment:

> The cancer guidelines emphasize the importance of weighing all of the evidence in reaching conclusions about the human carcinogenic potential of agents. This is accomplished in a single integrative step after assessing all of the individual lines of evidence…. Evidence considered includes tumor findings, or lack thereof, in humans and laboratory animals; an agent's chemical and physical properties, its structure-activity relationships (SARs) as compared with other carcinogenic agents; and studies addressing potential carcinogenic processes and mode(s) of action, either in vivo or in vitro.

CP at 81 (quoting U.S. EPA Guidelines for Carcinogen Risk Assessment, pp. 1-11 and 1-12).

8

The National Toxicology guidelines echo the weight-of-evidence approach for carcinogen risk assessment:

> [C]onclusions regarding carcinogenicity in humans or experimental animals are based on scientific judgment, with consideration given to all relevant information. Relevant information includes, but is not limited to, dose response, route of exposure, chemical structure, metabolism, pharmacokinetics, sensitive sub-populations, genetic effects, or other data relating to mechanism of action or factors that may be unique to a given substance.

CP at 81 (quoting NTP guidelines for carcinogen risk assessment).

Dr. Peter Gale, when forming his opinion of the causes of Judy Cundy's colorectal cancer, considered the following concepts and data: (1) molecular events underlying cancer development; (2) biological relationship between exposure to carcinogens and cancer development; (3) effects of such exposures on animal and human cells; (4) association between such exposures and cancer development in animals and humans; (5) mutation topography of colorectal cancer; (6) other known and suspected causes of colorectal cancer; (7) mechanisms of action of how diesel engine exhaust, including formaldehyde, and asbestos cause colorectal cancer; (8) data from experiments in animals exposed to diesel engine exhaust and asbestos; and (9) epidemiological data linking exposure to diesel engine exhaust and asbestos to colorectal cancer in humans. When forming his opinions, Dr. Gale considered data supporting and contradicting an opinion and the quality of the data.

Dr. Peter Gale utilized several strategies to review publications and data in scientific and biomedical literature when forming his opinion on general causation. He

performed searches for scientific and medical publications using the PUBMED search engine of the United States National Library of Medicine and Google Scholar. Dr. Gale read or re-read all or parts of textbooks covering diverse disciplines including medicine, cell biology, cancer biology, carcinogenesis, epidemiology, and statistics. Dr. Gale also reviewed Judy Cundy's medical records and expert reports of Professors Andrew Salmon and Paul Rosenfeld.

The United States National Toxicology Program (USTP), formed by the National Institutes of Health, the Centers for Disease Control, the Food and Drug Administration, the World Health Organization's International Agency for Research on Cancer (IARC), and the National Institute for Occupational Safety and Health classify diesel engine exhaust as a human carcinogen. The organizations base the classifications on epidemiologic data and biological models of mode and mechanism of action. IARC Monograph 105 on Diesel Engine Exhaust Particulates and Some Nitroarenes carries a detailed discussion of carcinogenic effects of diesel engine exhaust. The EPA also has published information on the mechanisms by which diesel engine exhaust causes human cancer.

IARC Monograph 105 reads:

> Occupational cohort studies showed no consistent patterns for other [human body] sites based on external comparisons and could not address potential confounders. Some case—control studies of cancers of the larynx and colon suggested a positive association with exposure to engine exhaust (unspecified mixtures of diesel and gasoline) or proxies of exposure; however, these were not consistently supported by results from cohort studies.

CP at 123.

In his report on the causation of Judy Cundy's colorectal cancer, Dr. Peter Gale removed some of this language in IARC Monograph 105. Dr. Gale's report simply reads:

> Some case-control studies of cancers of the larynx and colon suggested a positive association with exposure to engine exhaust (unspecified mixtures of diesel and gasoline) or proxies of exposure . . . .

CP at 154.

In the context of determining a chemical or substance's carcinogenicity in humans, scientific bodies, health authorities, and regulatory agencies consider the totality of laboratory, animal, and human data and biological plausibility using a weight-of-evidence approach. This determination is not tissue, organ, or site specific. For example, IARC Monograph 105 also states:

> A statement there is sufficient evidence [for carcinogenicity] is followed by a separate sentence that identifies the target organ(s) or tissue(s) where an increased risk of cancer was observed in humans. Identification of a specific organ or tissue does not preclude the possibility this agent may cause cancer at other sites.

CP at 62.

IARC Monograph 88F discusses articles related to risks of colorectal cancer in persons occupationally exposed to formaldehyde. The United States Environmental Protection Agency IRIS Report on Formaldehyde states: "Final analysis of the remaining 19 studies indicate that leukemia and neoplasms of the brain and colon may be associated with formaldehyde exposure." CP at 87.

11

Numerous studies of inhalation of diesel engine exhaust in mice and rats, summarized in IARC Monograph 105, report an increased incidence of cancers including colorectal cancer. Also, when formaldehyde mingles with other carcinogens, a synergistic effect of cancer induction occurs. Although the precise bioavailability of chemical mutagens and carcinogens from inhaled diesel engine exhaust is unknown, DNA adducts were found in lymphocytes from workers occupationally exposed to diesel engine exhaust.

During Dr. Peter Gale's deposition, BNSF counsel wished Dr. Gale to agree that the IARC study considers diesel engine exhaust carcinogenic to humans because of the studies solely on lung cancer. Dr. Gale disagreed. The IARC study is based on the sum of all data that shows the destruction of cells.

Dr. Peter Gale identified one study, mentioned in IARC 105, that showed diesel engine exhaust causes colorectal cancer. BNSF's expert, Dr. Douglas Weed, answered that the one study reached this conclusion at a 90 percent confidence level instead of the more common 95 percent confidence interval. Dr. Weed identified eleven studies involving colon, colorectal, or rectal cancer, published between 1977-2019, unmentioned by Dr. Peter Gale in the latter's report.

Dr. Peter Gale admitted that he could find no research articles that found diesel exhaust caused signet cell adenocarcinoma in the colon, Judy Cundy's form of cancer. In a deposition, Dr. Gale mentioned that most of the literature on diesel engine exhaust focused on lung cancer. Also, colon studies lumped all forms of colorectal cancer

12

together. Dr. Gale included Judy Cundy's form of colorectal cancer within the lumped cancers. Dr. Gale insisted that IRAC 105 supported his opinions that diesel exhaust causes all variants of cancer.

According to Dr. Peter Gale, diesel engine exhaust particulates enter the body and disperse at the cellular level. They metabolize and directly damage DNA, causing mutations that cause cancer in multiple organs. Cancer development typically entails multiple steps of accumulations of DNA. "Recent data from whole exome and whole genome sequencing of diverse human cancers indicate many mutations in DNA in most cancers, including colorectal cancer." CP at 90. Data shows that colorectal cancer results from the accumulation of mutations from several exposure to carcinogens such as diesel engine exhaust.

Dr. Peter Gale insists that his general causation opinions considered a wide range of data using a weight-of-evidence approach. He aggregated diverse types of medical and scientific evidence into a coherent analysis that answers the central question of whether diesel engine exhaust and asbestos can cause the type of harm suffered by Judy Cundy.

Based on the literature and accepted methods of determining specific causation, Dr. Peter Gale considered many factors to determine if diesel engine exhaust contributed to Judy Cundy's colorectal cancer: work records, job duties, exposure to carcinogens in her work environment, the nature of the carcinogens, duration of exposures, magnitude of exposures, any measurements of exposure, industrial records, a site visit, medical records,

insurance records, government records, timing of exposures to disease, medical and other scientific literature, epidemiology data, toxicological data, other case reports, his clinical experience, other risk factors causing colorectal cancer, Cundy's susceptibility to colorectal cancer, possible other etiologies, adequacy of prior medical care and diagnoses, response to removal from exposures, Cundy medical history, concurrent medical condition, a physical examination, laboratory tests, pathology tests, radiological tests, gender, family history, associated diseases, exposures to other carcinogens and other chemicals.

Judy Cundy also solicited Dr. Andrew Salmon to assist in the case. Dr. Salmon has over forty-five years of experience in the field of environmental toxicology. He earned a BA, MA, and PhD in Biochemistry from the University of Oxford. He formerly served as Chief and Senior Toxicologist of the Air Toxicology and Risk Assessment Section for the State of California Environmental Protection Agency.

When forming his opinion as to specific causation, Dr. Peter Gale relied on Dr. Andrew Salmon's calculation of Judy Cundy's increased risk to cancer as a result of her exposure to diesel engine exhaust. Professor Salmon calculated Judy Cundy's lifetime excess cancer risk as between 1821 and 2464 excess cancers per one million persons. This excess cancer risk is substantial, not trivial. Most regulatory agencies consider a de minimis level of cancer risk as 1 in 1 million. Cundy's exposure to diesel engine exhaust resulted in an excess cancer risk more than 1800 to 2400 times higher than de minimis.

Dr. Peter Gale conceded that Dr. Andrew Salmon's excess cancer risk calculation was not cancer type nor site specific. For example, the 2009 California EPA Technical Support Document for Cancer Potency Factors, co-authored by Dr. Andrew Salmon, does not distinguish between cancer types nor sites. The lack of this specificity lacked importance because diesel engine exhaust causes cancer by attacking the inside of cells in all parts of the human body. The California EPA document does not exclude any cancer type or site from the excess cancer risk from exposure to diesel engine exhaust. All California EPA program documents undergo rigorous scientific peer review and public comment before adoption.

The cancer potency factor for diesel engine exhaust used by Dr. Andrew Salmon, in his calculation of Cundy's excess cancer risk, follows recommendations of the National Research Council on cancer risk assessment. The United States EPA cancer risk assessment guidelines recognized that the mutational processes underlying cancer causation operate in all tissues and a genotoxic carcinogen such as diesel engine exhaust can cause cancers of any type at any site in the body. Diesel engine exhaust contains chemicals which act directly in causing mutations and is considered a multi-site carcinogen.

In his report for this litigation, Dr. Andrew Salmon wrote that, although most studies of the impact of diesel engine exhaust pertain to lung cancer, colon or colorectal cancers have been reported in workers exposed to diesel exhaust. Salmon repeated Dr. Peter Gale's observation that Cundy's colorectal cancer resulted from mutations at

15

the cellular level. Diesel engine exhaust, including its constituent polycyclic hydrocarbons, attacks inside human cells. Salmon "opined that exposure to diesel engine exhaust was more likely than not" a major contributor to Judy Cundy's colorectal cancer. CP at 96.

BNSF sometimes posits that Judy Cundy could have been exposed to other toxins in her daily life such that Dr. Peter Gale cannot with confidence testify that exposure to diesel engine exhaust caused her colorectal cancer. Dr. Andrew Salmon responded to this argument. BNSF cannot employ the presence of other toxins to decrease the chances that Cundy's exposure to diesel engine exhaust was a cause of her cancer. Other toxins would have an additive effect, if not a synergistic effect, on Cundy's overall cancer risk. Since diesel exhaust is a mutagenic carcinogen affecting DNA, her risk is related to the extent of mutations induced by the exposure to diesel exhaust. This risk is independent of any other mutagenesis or other toxic processes which may also be present. According to Dr. Salmon, the presence of other toxic chemicals in the workplace, in her other environments, or from smoking, would not decrease Cundy's excess cancer risk associated with her exposure to diesel exhaust, but would have the opposite effect.

Dr. Peter Gale avers that his "specific causation opinions required a different skill set" than forming an opinion on general causation. CP at 96. Dr. Gale relied on his extensive experience as a medical oncologist, which allowed the use of probabilistic reasoning to make a fully developed differential etiological opinion. As any knowledgeable physician would do, Dr. Gale considered and ruled out all other

16

alternatives as the sole cause, and he opined that Judy Cundy's occupational exposures to diesel engine exhaust likely was a cause of Cundy's colorectal cancer.

When discerning the cause of Judy Cundy's colorectal cancer, Dr. Peter Gale considered that Judy Cundy smoked twelve packs of cigarettes each year. Dr. Gale agreed that research studies link tobacco smoke to colorectal cancer, but he insisted that these studies excluded Judy Cundy's form of cancer, signet cell adenocarcinoma. Nevertheless, Dr. Gale could not cite to a single study. The information about tobacco smoke comes from his general knowledge. Dr. Peter Gale does not expect that Judy Cundy's cigarette smoking exposure increased the risk of her developing her signet cell type of colorectal cancer.

## CAUSTION UNDER FELA

Judy Cundy brings action against BNSF under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60, federal legislation providing compensation for railroad workers injured on the job due to the railroad's negligence. The superior court granted and this court's majority grants BNSF summary judgment on the basis that Cundy fails to present an issue of fact as to whether diesel engine exhaust emitted by BNSF trains caused her colon cancer. The majority's ruling fails to recognize the generous provisions of the Act that favor workers. This liberality extends to the worker's obligation to show causation. The majority's decision also ignores FELA cases that promote liberality, if not extreme liberality, in favor of workers responding to summary judgment motions.

FELA declares:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death *resulting in whole or in part from the negligence* of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (emphasis added). The United States Congress enacted FELA in 1908 to provide a tort compensation system for railroad workers who, at that time, experienced among the highest accident rates in United States history. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991). Congress was then dissatisfied with the common-law rules addressing the duty of a master to its servant. *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 507, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957).

In 1939, Congress reworked the language of FELA and stripped the railroads of common law defenses such as assumption of risk. Congress intended to leave to the fact-finding function of the jury the decision of the primary question raised in FELA cases—whether employer fault played any part in the employee's mishap. *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508 (1957).

In a series of decisions starting with *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, (1957) and then followed, most notably, by *Gallick v. Baltimore & Ohio Railroad*, 372 U.S. 108, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963), the Supreme Court recognized FELA's broad standards of fault and proximate cause. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991). In *Rogers v. Missouri Pacific Railroad*

*Co.*, the Court held that "the test of a [FELA] jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506 (1957). The Court also held that it was irrelevant whether the jury could also "with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 267 (3d Cir. 1991). Similarly, in *Gallick v. Baltimore & Ohio Railroad*, the Court stated that the worker presents a jury question of causation when there is "evidence that *any* employer negligence caused the harm, or, more precisely, enough to justify a jury's determination that employer negligence had played *any* role in producing the harm." *Gallick v. Baltimore & Ohio Railroad*, 372 U.S. 108, 116 (1963). Stated differently, FELA does not require Burlington Northern's negligence to be the sole cause of Judy Cundy's injuries. *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 502 n.6 (9th Cir. 1994). The employee meets her burden and the obligation of the employer to pay damages arises with proof, even though entirely circumstantial, from which the jury may with reason make that inference. *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 506 (1957).

The injury need not be an immediate result of an accident. *Urie v. Thompson*, 337 U.S. 163, 187, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949). A medical expert can testify to more than one potential cause of a plaintiff's condition. *Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 80 S. Ct. 173, 4 L.Ed.2d 142 (1959). Expert testimony

19

need only establish a small quantum of causation required by FELA. *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 504 (9th Cir. 1994).

Some cases, including one Washington decision, proclaim that, under FELA, the quantum of evidence sufficient to present a jury question of causation is less than in a common law tort action. *Crompton v. BNSF Railway Co.*, 745 F.3d 292, 296 (7th Cir. 2014); *Mullahon v. Union Pacific Railroad*, 64 F.3d 1358, 1363 (9th Cir.1995); *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *Pierce v. Southern Pacific Transportation Co.*, 823 F.2d 1366, 1370 (9th Cir.1987); *Nuckols v. Consolidated Rail Corp.*, 240 N.E.3d 373, 380 (Ohio Ct. App. 2024); *Norfolk Southern Railway Co. v. Sumner*, 297 Va. 35, 42, 822 S.E.2d 809, (2019); *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 490, 369 P.3d 966, (2016); *Anderson v. BNSF Railway*, 380 Mont. 319, 326, 354 P.3d 1248, 1256 (2015); *Moore v. Union Pacific Railroad*, 83 Wn. App. 112, 115, 920 P.2d 616 (1996). Assuming this statement of the law teaches that the plaintiff need not fulfill the common law burden of showing the railroad's negligence to be a substantial cause of her injury, I consider the statement accurate. *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 951, 509 P.3d 306 (2022). The worker need only show the railroad's conduct to be a slight cause. But the quoted statement of the law suggests something more—that the worker may present evidence both weak as to quantity and quality and still prevail, including on the element of causation. None of the FELA decisions, however, outright read as such.

I am unable to mathematically measure the weakness of the quantity or quality of evidence. I cannot divine any line for the quantity or quality of evidence above which the plaintiff defeats a summary judgment motion or below which the defendant succeeds in the motion. Nevertheless, the cases direct me to grant summary judgment to the railroad only as a last resort. Still Judy Cundy presents a large quantity and strong quality of evidence to support her suit.

### Summary Judgment Principles

The liberal view of causation in a FELA action bleeds into summary judgment rules. Generally, summary judgment is proper if the records on file with the trial court show no genuine issue as to any material fact. CR 56(c). The appeals court, like the trial court, construes all evidence and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Casualty Company*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972). The moving party bears the burden to demonstrate no genuine dispute as to any material fact, and reasonable inferences from the evidence must be resolved against the moving party. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 349, 588 P.2d 1346 (1979). The motion should be granted only if, from all the evidence, a reasonable person could reach only one conclusion. *Lamon v. McDonnell Douglas Corp.*, 91 Wn.2d 345, 346 (1979). If any genuine issue of material fact exists, the court must order a trial. *LaPlante v. State*, 85 Wn.2d 154, 158, 531 P.2d 299 (1975).

Cause in fact usually presents a question for the trier of fact and is generally not susceptible to summary judgment. *Martini v. Post*, 178 Wn. App. 153, 164, 313 P.3d 473

(2013). In most instances, the question of cause in fact is for the jury. *Daugert v. Pappas*, 104 Wn.2d 254, 257, 704 P.2d 600 (1985). The plaintiff can survive a motion to dismiss if he presents "some competent evidence of factual causation" that precludes jury speculation. *Estate of Bordon v. Department of Corrections*, 122 Wn. App. 227, 242, 95 P.3d 764 (2004). The court may decide cause in fact as a matter of law, however, if the facts and inferences from them are plain and not subject to reasonable doubt or difference of opinion. *Daugert v. Pappas*, 104 Wn.2d 254, 257, (1985). Stated another way, causation becomes a question of law for the court only when the causal connection is "so speculative and indirect" that reasonable minds could not differ. *Mehlert v. Baseball of Seattle, Inc.*, 1 Wn. App. 2d 115, 119, 404 P.3d 97 (2017); *Doherty v. Municipality of Metropolitan Seattle*, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996). Use of the phrase "so speculative" suggests degrees of speculation such that the jury should often be the decider of speculation.

Summary judgment procedure aims to avoid a useless trial. *Preston v. Duncan*, 55 Wn.2d 678, 681, 349 P.2d 605 (1960). Trial is not useless but absolutely necessary when issues of fact could lead to liability against the defense. *Preston v. Duncan*, 55 Wn.2d 678, 681 (1960).

FELA decisions emphasize the liberality of the rules favoring the nonmoving party worker. Courts broadly interpret the concept of causation under FELA in response to a summary judgment motion. *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 268 (3d Cir. 1991). A trial court is justified in withdrawing issues from the jury's

consideration only in those "extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee." *Pehowic v. Erie Lackawanna Railroad*, 430 F.2d 697, 699-700 (3d Cir. 1970). I have always thought one standard of proof exists when denying a summary judgment if the plaintiff submits facts to support each element of the cause of action. This FELA principle, however, suggests that the courts must go to the extreme end of nothingness on the evidentiary spectrum before granting a motion.

In reviewing a motion for summary judgment, the judge must consider the actual quantum and quality of proof necessary to support liability. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Harbin v. Burlington Northern Railroad Co.*, 921 F.2d 129, 130-32 (7th Cir. 1990). The quantum of evidence required to establish liability in a FELA case is much less than in an ordinary negligence action. *Caillouette v. Baltimore & Ohio Chicago Terminal Railroad Co.*, 705 F.2d 243, 246 (7th Cir.1983); *Heater v. Chesapeake & Ohio Railway Co.,* 497 F.2d 1243, 1246-47 (7th Cir.1974). Under FELA, jury verdicts for the plaintiff can be sustained on evidence which would not be sufficient in the ordinary negligence action. *Harbin v. Burlington Northern Railroad Co.*, 921 F.2d 129, 131 (7th Cir. 1990). This view should be limited to evidence of causation not liability. Under FELA, the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played *any part, even the slightest,* in producing the injury. *Rogers v. Missouri Pacific Railroad Co.,* 352 U.S. 500, 506, 77 S. Ct. 443, 1 L.Ed.2d 493 (1957).

The lenient standard for avoiding summary judgment under FELA merely mirrors the pro-plaintiff slant of the substantive law. *Harbin v. Burlington Northern Railroad Co.*, 921 F.2d 129, 131 (7th Cir. 1990). Dissatisfied with the common law duty of the master to its servant, Congress enacted FELA to require employers to shoulder responsibility for damages attributable in whole or in part to their negligence. *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 507-08 (1957). The right to a jury determination is part and parcel of the liberal remedy afforded the working person under FELA. *Bailey v. Central Vermont Railway*, 319 U.S. 350, 354, 63 S. Ct. 1062, 87 L. Ed. 1444 (1943). A long line of FELA cases reiterates the lesson that the statute vests the jury with broad discretion to engage in common sense inferences regarding issues of causation and fault. *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 510 (1943). The jury is the tribunal to which the law delegates the duty to apply the elusive concepts of reasonable care and cause and effect to the manifold facts and circumstances of each individual case. *Bailey v. Central Vermont Railway*, 319 U.S. 350, 354 (1943).

Standard of Review

The majority commits a fundamental error, advocated by BNSF, when it holds that the trial court did not abuse its discretion when excluding Dr. Peter Gale's opinion on causation of Judy Cundy's colorectal cancer. Although appellate courts generally review a decision to exclude expert witness testimony at trial under an abuse of discretion standard, the de novo standard of review applies when reviewing trial court evidentiary rulings made in conjunction with a summary judgment motion. *Frausto v. Yakima HMA,*

24

*LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017); *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 431, 527 P.3d 1160 (2023); *Watness v. City of Seattle*, 16 Wn. App. 2d 297, 304-305, 481 P.3d 570 (2021).

An appellate court would not properly accomplish its charge if the court did not examine *all* the evidence presented to the trial court, including evidence that had been redacted. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). Thus, the appellate court must employ the de novo standard of review when reviewing all trial court rulings made in conjunction with a summary judgment motion. *Folsom v. Burger King*, 135 Wn.2d 658, 663 (1998); *Asphy v. State*, 31 Wn. App.2d 605, 613, 552 P.3d 325 (2024). This standard of review accords with the requirement of viewing evidence and inferences in favor of the nonmoving party. *Folsom v. Burger King*, 135 Wn.2d 658, 663 (1998). The standard of review also fulfills the dictates that the appellate court conduct the same inquiry as the trial court. *Folsom v. Burger King*, 135 Wn.2d 658, 663 (1998).

The majority correctly notes that the Supreme Court did not directly address the admissibility of expert opinions in either *Frausto v. Yakima HMA, LLC* or *Folsom v. Burger King*. In turn, the majority perspicaciously declaims that *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 919, 296 P.3d 860 (2013), reads that the appellate court reviews a decision excluding expert testimony, during a summary judgment proceeding, for an abuse of discretion. I agree to this reading, to a limited extent. The Supreme Court wrote, in *Lakey v. Puget Sound Energy, Inc.*:

> We review de novo a trial court's exclusion of evidence under *Frye* [*v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923)]. *Anderson*, 172

25

> Wn.2d at 600, 260 P.3d 857. We review a trial court's decision concerning the admissibility of expert testimony for an abuse of discretion. *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007).

176 Wn.2d at 913. The two sentences initially appear contradictory because an exclusion of evidence under *Frye* constitutes a decision concerning the admissibility of expert testimony. I assume the Supreme Court intended to distinguish between exclusion of an expert opinion under the *Frye* test from exclusion under ER 702. In Judy Cundy's appeal, our court only addresses exclusion under ER 702.

In *Lakey v. Puget Sound Energy, Inc.*, the Washington Supreme Court reviewed the grant of a summary judgment motion. But using the *Lakey* opinion to support a principle that the appeals court reviews, for an abuse of discretion, a summary judgment ruling whereby the court excluded an expert opinion bears problems. The Supreme Court never directly addressed the standard of review for such a ruling in a summary judgment proceeding. The Supreme Court never analyzed whether the standard of review for evidentiary rulings, in a summary judgment proceeding, should shift from a de novo standard to an abuse of discretion standard when addressing the reliability of an expert's opinion. The majority, in Judy Cundy's appeal, posits no reason to distinguish between a ruling on the admissibility of an expert opinion from other evidentiary rulings attended to a summary judgment motion.

In *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 260 P.3d 857 (2011), the state Supreme Court applied a de novo standard of review when determining the correctness of the trial court's exclusion, under *Frye*, of an expert's testimony as part of a

summary judgment motion. No reason exists to distinguish between a ruling under *Frye* from a ruling under ER 702 for purposes of appellate review. *Frye* and ER 702 work together to regulate expert testimony. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013). In *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 527 P.3d 1160 (2023) and *Watness v. City of Seattle*, 16 Wn. App. 2d 297, 313, 481 P.3d 570 (2021), this lesser court applied de novo review to ER 702 rulings on summary judgment.

I must rule consistent with how I would anticipate the Supreme Court to rule. I deem myself faithful to Supreme Court precedent by applying a de novo standard to the exclusion of Dr. Peter Gale's expert opinions. Such a ruling follows the stated rule in summary judgment proceedings. I would not accomplish my charge to employ a de novo standard of review when reviewing all trial court rulings in conjunction with a summary judgment motion. I would not fulfill the spirit behind allowing a FELA plaintiff a jury trial if some evidence supports causation. To emphasize, the Supreme Court proclaimed in *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231 (2017) and *Folsom v. Burger King*, 135 Wash.2d 658, 663 (1998): "[t]he de novo standard of review is used by an appellate court when reviewing *all* trial court rulings made in conjunction with a summary judgment motion." (Emphasis added).

In *Garner v. BNSF Ry. Co.*, 98 Cal. App. 5th 660, 316 Cal. Rptr. 3d 862 (Cal. Ct. App. 2024), the trial court granted summary judgment to the railway after the court excluded an expert's opinion on the basis of the purported unreliability of the opinion.

27

On appeal, the reviewing California court reversed in part after ruling that it reviews all evidentiary rulings, attended to a summary judgment motion, de novo, including rulings based on the alleged unreliability of an expert's testimony.

I would reverse the trial court even if we applied an abuse of discretion standard. Nevertheless, the majority's error in employing an abuse of discretion standard may critically impact the outcome of this appeal.

Reliability of Expert Opinion

With the teaching of liberality toward a FELA plaintiff, I approach the meat of the appeal—the reliability of expert testimony. Both *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) and ER 702 govern the admissibility of expert testimony in Washington. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600, 260 P.3d 857 (2011). *Frye* concerns whether the scientific expert followed accepted methods when drawing conclusions. ER 702 otherwise addresses the reliability of the opinions. I agree with the majority's ruling that the *Frye* decision does not apply. I address only ER 702.

ER 702 declares:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In fulfillment of the language in ER 702, expert testimony is typically admissible if: (1) the expert is qualified, (2) the expert relies on generally accepted theories in the scientific community, and (3) the testimony would be helpful to the trier of fact. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014). For purposes of the appeal,

BNSF agrees that Dr. Peter Gale is a qualified expert. BNSF conflates the remaining two elements of the test when arguing that Dr. Gale's opinion will not help the jury because of the unreliability of the opinions based in part on the supposed failure to adhere to methodologies that even Dr. Gale promotes.

Trial judges perform an important gatekeeping function when determining the admissibility of evidence. ER 104. ER 702 requires the trial court to determine that the testimony will assist the trier of fact. *Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 634, 578 P.3d 306 (2025). Under ER 702, the trial court must exclude testimony unhelpful to the jury. *L.M. v. Hamilton*, 193 Wn.2d 113, 117, 436 P.3d 803 (2019); *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918 (2013). Expert testimony helps the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600 (2011); *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). Unreliable evidence does not assist the jury. *L.M. v. Hamilton*, 193 Wn.2d 113, 117 (2019); *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 357 (2014); *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 600 (2011). Evidentiary rules provide significant protection against unreliable, untested, or junk science. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 606 (2011).

The evidence must rise above speculation, conjecture, or mere possibility. *Reese v. Stroh*, 128 Wn.2d 300, 309, 907 P.2d 282 (1995). Conclusory or speculative expert opinions lacking an adequate foundation will not be admitted. *Asphy v. State*, 31 Wn. App. 2d 605, 622-23, 552 P.3d 325 (2024). If the court worries that expert testimony is

"somewhat speculative," the court should consider any danger that the jury may be overly impressed with a witness possessing the aura of an expert. *Asphy v. State*, 31 Wn. App. 2d 605, 623 (2024). When the opposing party presents opposing expert opinions, this concern by a trial court should wane.

Still the trial court plays a limited role as evidentiary gatekeeper. *Sargon Enterprises, Inc.*, *v. University of Southern California*, 55 Cal. 4th 747, 772, 149 Cal. Rptr. 3d 614, 288 P.3d 1237 (2012). In minding the gate, the trial court must not second-guess the judgment of a qualified expert who has provided a reasonable scientific explanation for his conclusions and used a scientifically accepted methodology for reaching them based on the available data, even if the data itself is inconclusive. *Garner v. BNSF Ry. Co.*, 98 Cal. App. 5th 660, 679, 316 Cal. Rptr. 3d 862 (Cal. Ct. App. 2024). So long as an expert's testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities. *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11, 15 (1st Cir. 2011).

Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); *Asphy v. State*, 31 Wn. App. 2d 605, 621 (2024); *Driggs v. Howlett*, 193 Wn. App. 875, 905 (2016). A borderline case should be decided in favor of admissibility, allowing the jury to decide for itself whether the opinion is reliable. *Asphy v. State*, 31 Wn. App. 2d 605, 623 (2024). If a medical expert opines that a causal relationship is

30

probable or more likely than not, the quality of the evidence rises above speculation and conjecture and may be considered by the trier of fact. *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 438 (2023).

Washington's principles of reliability of expert testimony conflict. ER 702 excludes testimony when the expert fails to adhere to a reliable methodology. *Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 634-35, 578 P.3d 306 (2025); *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918–19 (2013). But at the same time, the law, as declared in numerous Washington decisions, holds that, whether the expert performs a given scientific technique correctly in a particular instance, goes to the weight, not admissibility, of his testimony. *Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 634-35, 578 P.3d 306 (2025); *State v. Copeland*, 130 Wn.2d 244, 270, 922 P.2d 1304 (1996); *State v. Gentry*, 125 Wn.2d 570, 586, 888 P.2d 1105 (1995); *State v. Gregory*, 158 Wn.2d 759, 830, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). Stated differently, an objection that an expert employed the methodology in an improper or unscientific manner goes only to the credibility of the expert's opinion, not the admissibility of the expert's testimony. *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418, 442 (2023). Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987); *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 607 (2011).

I need not resolve the anomaly in Washington law. Regardless of whether compliance with a methodology implicates admissibility, not only credibility, Dr. Peter Gale followed a permissible methodology when he employed his knowledge of how formaldehyde mutates the innards of a cell no matter where the cell lies within the human body.

The expert's testimony need not be conclusively reliable or indisputably valid before admitted into evidence. *State v. Corriher*, 184 N.C. App. 168, 645 S.E.2d 413 (2007). The opponent attacks shaky evidence by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). When a proponent establishes the baseline foundation of an opinion, the jury sifts through the contradictory evidence. *Hale County A&M Transport, LLC v. City of Kansas City, Mo.*, 998 F. Supp. 2d 838, 845 (W.D. Mo. 2014). Gaps in an expert witness' knowledge generally go to the weight of the witness' testimony, not its admissibility. *Robinson v. GEICO General Insurance Co.*, 447 F.3d 1096, 1100-01 (8th Cir. 2006); *Lauria v. National Railroad Passenger Corp.*, 145 F.3d 593, 598 (3d Cir. 1998).

An expert may draw his or her opinions from various sources. Many expert medical opinions are pure opinions based on experience and training rather than scientific data or research for the pending case. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 610 (2011). An expert may testify based solely on experience without referencing industry literature. *Primiano v. Cook*, 598 F.3d 558, 566 (9th Cir. 2010). An expert may

base his opinion testimony on his belief or idea rather than on direct knowledge of the facts presented in the case. *State v. Demery*, 144 Wn.2d 753, 760, 30 P.3d 1278 (2001); *State v. Sutherby*, 138 Wn. App. 609, 617, 158 P.3d 91 (2007), *aff'd on other grounds*, 165 Wn.2d 870, 204 P.3d 916 (2009). A physician or other qualified expert may base a conclusion about causation through a process of ruling out potential causes with due consideration to temporal factors, such as events and the onset of symptoms. *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 610 (2011); *Reese v. Stroh*, 128 Wn.2d 300, 307, 309 (1995).

A causation expert need not rely on a specific study or other scientific publication expressing precisely the same conclusion at which the expert has arrived. *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1229 (9th Cir.1198). The scientific expert may draw on his knowledge to reach a conclusion on causation without epidemiological studies showing a causal link. *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017); *Turner v. Iowa Fire Equipment Co.*, 229 F.3d 1202, 1208-1209 (8th Cir. 2000).

Publication of scientific evidence is not a *sine qua non* of admissibility. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Publication does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published. *Garner v. BNSF Ry. Co.*, 98 Cal. App. 5th 660, 316 Cal. Rptr. 3d 862 (Cal. Ct. App. 2024). Some propositions are too particular, too new, or too limited of interest to be published.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

I disagree with majority's conclusion that FELA's relaxed substantive causation standard does not lower our evidentiary gatekeeping requirement for expert testimony. The rules governing admissibility of expert witness opinions may not change, but the standard of causation influences the needed firmness of the expert opinion. Instead of the plaintiff needing an expert's conclusion that the activity of the defendant likely was a principal cause of the plaintiff's injury, the plaintiff survives summary judgment dismissal if the expert opines that the defendant's actions were only a slight cause.

To discern whether Dr. Peter Gale's expert opinions defeat BNSF's summary judgment motion, I dissect numerous Washington decisions and FELA opinions that address the same question of whether ER 702 precludes the testimony. I proceed in chronological order. To shorten a lengthy opinion, I reduce each opinion to its essential facts and analysis.

In *Harbin v. Burlington Northern Railroad Co.*, 921 F.2d 129 (7th Cir. 1990), David Harbin cleaned heating boilers located in the railroad's roundhouse. Harbin cleaned by pushing and pulling a vibrating brush mounted on a long pole. The brush dislodged the soot, rust, and other grit accumulated over the course of the year on the boilers' interior walls. An air pressure hose then forced this debris out of the boilers and dispersed into the open air. While performing a cleaning, Harbin experienced pain in his

chest and left arm, felt short of breath, and perspired heavily. Harbin had suffered a heart attack.

The roundhouse where David Harbin worked possessed no special system of ventilation, even though locomotives left running in the building generated clouds of exhaust fumes and the boiler cleaning process flooded the air with soot and other particles of debris. Even after Harbin and other employees complained of inadequate ventilation to their railroad foremen, the railroad took no action to alleviate the problem. The railroad did, however, allow other employees to vacate the area while the boilers were being cleaned. It also supplied workers with breathing cups to be placed over their mouths, but not their noses, to prevent the inhalation of foreign particles.

David Harbin filed suit against his former employer, the Burlington Northern Railroad Company pursuant to FELA. Harbin's complaint alleged that the railroad negligently failed to provide adequate ventilation or proper equipment with which to perform the boiler cleaning task. Harbin claimed that the breathing cups offered scant protection from a work environment pervaded with soot and other debris. Harbin needed to change his breathing cup three or four times each day because of encrustment with exhaled soot. The railroad should have supplied larger face masks or utilized a safer method, such as a vacuum cleaner, of removing the soot dispersed in the boiler cleaning process.

David Harbin proffered testimony of medical expert Dr. Sheldon Slodki to establish a link between the railroad's negligence and his injury. At his deposition,

Dr. Slodki testified that inhalation of particulate matter may irritate the lungs, causing impairment of oxygen in the blood stream and forcing the heart to pump at a rapid rate. Slodki offered his opinion that the strenuous physical exertion involved in cleaning the boilers, compounded by the additional stress upon the heart attributable to the sooty atmosphere, precipitated Harbin's heart attack.

The district court granted a summary judgment motion when ruling that Harbin presented insufficient evidence of negligence. Without knowledge of the precise quantity or composition of soot present in the air, the district court ruled that a jury would be unable to assess the reasonableness of the railroad's conduct. On appeal, David Harbin argued that he need not have presented evidence of the exact amount of particulate matter in the air for his case to go to a jury in light of the broad remedial objectives underlying FELA. The railroad characterized Harbin's claim as pure fantasy. The circuit court of appeals agreed with David Harbin.

The circuit court of appeals, in *Harbin v. Burlington Northern Railroad Co.*, concluded that David Harbin need not have identified the specific composition and density of soot present in his work environment to survive a summary judgment motion. While expert testimony documenting the hazards posed by the presence of so many parts per million of soot in the air would have enhanced Harbin's case, such evidence was not essential.

In *Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3d Cir. 1991), Oscar Hines (Hines) worked as a railway laborer from 1964 to 1976. He occasionally worked in the

railroad's Paoli yard. Hines' work consisted primarily of maintaining railroad tracks both manually and with a regulator that swept material from the tracks and ties. Hines worked, ate, and slept in railyards and camps. In June 1987, Hines was diagnosed with bladder cancer. In addition, he developed chronic obstructive and restrictive lung disease. Hines contended that his injuries resulted from his exposure to polychlorinated bihenyls (PCBs) and other toxic chemicals during his work in the Paoli railyard even though he had had only limited contact with the railyard.

Dr. Harry Shubin, an internist, stated that Oscar Hines was exposed to PCBs used as dielectric fluid in railroad car transformers. The transformers leaked onto track beds. Based on Dr. Shubin's examination of Hines, Dr. Shubin linked the exposure to Hines' cancer and lung disease. Dr. Shubin also stated that Hines was affected by his inhalation of heavy dust contaminated with PCBs while operating a regulator. To form his opinion, Hines read articles on the toxicity of PCBs. Nevertheless, Hines could not identify any articles establishing a direct connection between PCBs and bladder cancer.

Consolidated Rail sought dismissal of Oscar Hines' suit because of an alleged lack of evidence that Hines' exposure to PCBs or other toxic chemicals during his employment with Conrail caused his injuries. Conrail contended that Harry Shubin's testimony on causation was inadmissible because his opinions were without foundation and the evidence is "equivocal." Shubin presented no information regarding the presence or concentration of PCBs on any part of the railroad track where Hines worked, although he assumed that Hines was exposed to the PCBs that leaked onto track beds.

The testing for PCB concentration in Oscar Hines' blood and fat showed that Hines had not been exposed to a greater concentration of PCBs relative to the general population. Although Hines implicated PCBs and possibly other toxic chemicals for his bladder cancer, Hines had also been a heavy cigarette smoker. Harry Shubin conceded that individuals with comparable smoking habits had an elevated risk of bladder cancer and could also contract bladder cancer solely from exposure to cigarette smoke.

Consolidated Rail relied on two affidavits to support its contention that Dr. Harry Shubin's opinions contradicted standard medical and scientific opinions on the effects of PCB exposure. Eleven medical doctors and scientists signed the first affidavit. They stated that, based on their review of the literature on PCBs, no evidence existed for determining that PCBs caused cancer or other types of disorders, such as hypertension or cardiovascular disease. The second affidavit, provided by Dr. Kenneth H. Chase, whose practice involved the evaluation of people exposed to PCBs, concluded that no evidence linked PCBs to bladder cancer or to any of the other complications that Hines suffered.

Consolidated Rail emphasized that none of the articles Harry Shubin reviewed reported any epidemiological findings, apart from those that resulted from animal studies or from poisoned food incidents in Taiwan and Japan, demonstrating that PCBs were a definitive carcinogen. Consolidated Rail characterized Shubin's opinions as "conjectural guesses," which "fail adequately to consider multiple etiologic factors, as well as obvious differential diagnoses," and "would not withstand review by a qualified panel of his peers."

The circuit court of appeals reversed the summary judgment that was granted to the railroad. The court concluded that Harry Shubin used traditional methods to form his opinion by reviewing a variety of background factors that are normally investigated in the medical profession, including: Hines' histories of other exposures to toxins, drugs, and alcohol, and scientific literature that indicates that PCBs can be associated with severe health problems, including cancer. Thus, even though Shubin's opinion could be considered "novel," it was reliable.

The court, in *Rubanick v. Witco Chemical Corp.*, 125 N.J. 421, 593 A.2d 733 (1991), addressed the *Frye* standard rather than ER 702. Nevertheless, the case adopted a liberal standard for admitting expert testimony on the cause of cancer. The estates of deceased employees sued the employer and manufacturer alleging wrongful death caused by exposure to PCBs on the jobsite. Before trial, the trial court granted the manufacturer's motion to preclude testimony from Rubanick's expert witness, Dr. Earl Balis. Dr. Balis held a doctorate in biochemistry. Although recently retired, Dr. Balis had been a primary cancer researcher at the Sloan–Kettering Cancer Center in New York City for over thirty-seven years. He had headed a research group primarily concerned with investigating the cause, diagnosis, and treatment of colon cancer. He had also served as chairman of the Department of Biochemistry of the Cornell University Medical College. He was a proud member of the National Large Bowel Cancer Committee and an associate editor of the publication *General Cancer Research.* He had personally authored or participated in the publication of approximately 170 scientific articles, of which

39

approximately fifteen concern carcinogenesis. Dr. Balis never personally examined

Ronald Rubanick.

Earl Balis opined that occupation exposure to PCBs caused Ronald Rubanick's

colon cancer. He based his opinion in part on thirteen articles, out of thirty-nine articles

he reviewed, about the effects of exposure to PCBs on animals and human beings. In his

report, however, Balis did not mention any literature targeting colon cancer as opposed to

cancer in general. The manufacturer Monsanto presented a gaggle of physicians who

testified to the lack of evidence supporting a causal link between cancer and PCBs. One

expert highlighted the lack of literature suggesting that colon cancer had a relationship to

PCB exposure. A second expert faulted Balis for failing to use the scientific method

when arriving at his opinion. A third expert testified that few studies addressed the

effects of PCBs on humans and those studies were inconsistent.

In reversing the trial court's exclusion of Dr. Earl Balis' opinions, the New Jersey

Supreme Court emphasized the difficulties in proving causation in toxic-tort litigation.

The difficulties arise from the delayed effects from toxins and the inability of current

science to identify precisely the causes of cancer. The imprecision of estimating the

impact of environmental and occupational carcinogens derives from the central

uncertainty surrounding the nature of carcinogenesis.

The New Jersey court noted the extensive qualifications of Dr. Earl Balis. The

court stated that the qualifications of the expert proffering relatively new scientific

knowledge must be factored into the determination of the soundness of the methodology used.

In *Reese v. Stroh*, 128 Wn.2d 300, 907 P.2d 282 (1995), William Reese brought a medical malpractice action against Dr. James E. Stroh Jr., alleging that Stroh negligently failed to treat Reese's emphysema with the protein replacement therapy Prolastin. The trial court excluded Reese's expert medical witness' opinion regarding causation as lacking sufficient foundation to go to the jury. The Court of Appeals reversed, and the Supreme Court affirmed the Court of Appeals.

In 1984, William Reese visited Dr. Stephen Aprill for treatment of asthma. One year later, Dr. Aprill referred Reese to Dr. James Stroh because he believed Reese's condition involved more than asthma. Stroh was board certified in internal medicine, allergy, and immunology. In spring 1985, Stroh diagnosed Reese as having asthma, chronic obstruction pulmonary disease, and alpha–1–antitrypsin deficiency (AAT deficiency). AAT deficiency is a rare genetic disease characterized by low serum levels of AAT, a blood-borne protein which inhibits the destructive action of certain enzymes in the lung. In some patients with AAT deficiency, those uninhibited enzymes can destroy lung tissue, causing emphysema.

In spring 1985, Prolastin was not available to treat AAT deficiency. James Stroh prescribed bronchodilator medications, steroids, and antibiotics, urged William Reese to stop smoking, and instructed him to avoid allergens and environmental irritants.

In November 1989, William Reese learned that his brother also had been diagnosed with AAT deficiency and had begun Prolastin therapy, which the Food and Drug Administration (FDA) approved in 1987. The FDA approved Prolastin for treatment of AAT-deficient patients based on the knowledge that Prolastin raised the level of antitrypsin in the blood, but without statistical proof of its efficacy. Reese called James Stroh to inquire about Prolastin therapy. Stroh declined to prescribe Prolastin because he regarded it as an expensive therapy of unproven benefit, and because he thought Prolastin therapy posed possible risks for transmission of blood-borne infections. In March 1990, Reese began Prolastin therapy with his brother's doctor.

In his lawsuit, William Reese alleged that James Stroh's failure to prescribe Prolastin resulted in a preventable worsening of his lung function. Reese argued that Stroh should have treated him with Prolastin between 1987, when Prolastin was approved by the FDA, and 1989, when his lung capacity fell below the critical range for treatment. Stroh filed a motion in limine to exclude the testimony of Reese's experts on causation. Stroh contended that the experts lacked the foundation to state with reasonable medical certainty that the 18-month delay in Prolastin treatment caused Reese's current pulmonary condition.

Dr. Robert J. Fallat, chief of the pulmonary division at California Pacific Medical Center in San Francisco, testified for William Reese. Dr. Fallat, board qualified in internal and pulmonary medicine, had performed research on AAT deficiency since 1966. On the basis of the information and studies supporting the FDA's approval of Prolastin,

his own clinical experience, and information regarding Reese's medical condition, Dr.
Fallat concluded that, based upon reasonable medical probability, Prolastin therapy
would have earlier been effective for Reese.

The superior court excluded Dr. Robert Fallat's opinion because Fallat lacked a
statistically significant basis for his opinion as to the efficacy of Prolastin therapy in
treating William Reese's malady. The Supreme Court held the ruling to be error. Dr.
Fallat's testimony would prove helpful to the trier of fact. An expert's conclusions need
not be based on statistics. The jury could weigh whether the lack of statistical support
with Fallat's reasons for his opinion such as his experience in treating AAT deficiency
and his reliance on studies using Prolastin therapy.

*Anderson v. Akzo Nobel Anderson Coatings, Inc.*, 172 Wn.2d 593 (2011) analyzed
the *Frye* test, not ER 702. Julie Anderson worked for Akzo Nobel Coatings. Anderson
regularly mixed paint. Company policy required employees to wear respirators when
mixing paint, but the company did not rigorously enforce the policy, and management
undermined the policy. Some evidence showed that the company did not maintain the
respirators and the company purposely improperly maintained the air testing in the
mixing room.

Julie Anderson gave birth to Dalton in January 2000. By 2003, health care
providers had diagnosed Dalton with a neuronal migration defect, congenital hemiplegia,
microcephalus, and a multicystic dysplastic kidney. Dalton suffered delays in motor,
communication, cognitive, and adaptive behavior. Dr. Sohail Khattak, who published a

paper on the correlation between exposure to organic solvents in utero and birth defects while a fellow at the Clinical Pharmacology and Toxicology Division of the University of Toronto, averred that organic solvent exposure caused Dalton's birth defects.

Julie Anderson sued Akzo Nobel Coatings for negligence. Akzo successfully moved in limine to strike most of Anderson's experts, on the ground that their proposed testimony did not meet the *Frye* standard. Based on that ruling, the court granted Akzo summary judgment dismissal of the suit.

Julie Anderson relied mostly on the expert opinion of Dr. Sohail Khattak. Khattak based his opinion on Dalton's medical records, including the opinion of Dalton's cardiologist that Dalton's significant medical problems may "very likely" be as a result of exposure to organic solvents in utero. Khattak further grounded his opinion on Akzo's safety data sheets. Finally, Khattak relied on his own experience and training, including a study he performed that the Journal of the American Medical Association (JAMA) reported. The study matched 125 women, who were exposed to organic solvents at their work places while they were pregnant, with 125 controls—expectant mothers who were not exposed to organic solvents—and then followed these women prospectively. The study found that thirteen members of the exposed group gave birth to babies with major malformations, versus only one member of the unexposed group. The major malformations ranged from heart malformations to urinary tract malformations. The expected rate of major malformations was 1 percent to 3 percent. Thus, the 10.4 percent rate in the exposed group was significant.

The JAMA study listed the thirteen different major malformations, only one of which was described as a neuronal migration defect, one of Dalton's maladies. The implication was that *only one* of the children born to the mothers in the exposed group showed a neuronal migration defect. Sohail Khattak acknowledged at his deposition that the ailment is found in at least of 1 out of every 2,500 births, even in populations with no known organic solvent exposures.

Akzo Nobel Coatings' expert, Dr. Gideon Koren, a coauthor of the JAMA article, declared that the article did not establish the existence of a causal relation between exposure to organic solvents and birth defects. According to Dr. Koren, the relevant scientific community had yet to seriously research whether exposure to the specific type of organic solvents present in Akzo's auto paint could cause the specific type of birth defects suffered by Dalton. Akzo asserted that Sohail Khattak tacitly acknowledged no general consensus on any causal connection when, in a deposition, he answered: "we don't have enough research, you're absolutely right" and when he characterized the state of scientific knowledge as "evolving." Akzo contended that a medical opinion must be more than based on accepted scientific techniques. To be admissible, the expert's theory of causation must also be generally accepted in the scientific community. The trial court agreed and granted the motion in limine excluding Dr. Khattak's testimony.

In reversing the trial court, the Supreme Court noted that an expert may base his opinion on pure science without satisfying the *Frye* test. Dr. Sohail Khattack testified that the scientific community accepted that toxic solvents like the ones to which

45

Anderson was exposed are fat soluble, pass easily through the placenta, dissolve into the amniotic fluid inside the uterus, and may damage the developing brain of a fetus within the uterus.

BNSF principally relies on *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 296 P.3d 860 (2013), when arguing the inadmissibility of Dr. Peter Gale's opinion. In *Lakey*, homeowner plaintiffs sued Puget Sound Energy (PSE), alleging that the electromagnetic fields (EMFs) emanating from a company power station trespassed on their neighboring properties. The homeowners asserted that the EMFs injured their health and interfered with the use and enjoyment of their property. PSE moved to dismiss all of the homeowners' claims under CR 12(b)(6) because the EMFs emitted by the substation have no deleterious health effects.

In response to PSE's motion, the homeowners submitted declarations by experts Dr. Be Kun Li and Dr. David Carpenter with attached scientific studies and statements issued by governmental bodies. PSE moved to exclude the testimony of Li and Carpenter under ER 702 and the rule announced in *Frye*.

During a *Frye* hearing, David Carpenter testified that he concluded that EMF was a possible cause of childhood and adult leukemia, Alzheimer's disease, amyotrophic lateral sclerosis, and infertility. Carpenter also testified about the methodology he employed to reach his conclusions. Carpenter explained that he performed no original research. Instead, he performed a literature review, reanalyzing data collected by others as part of peer reviewed epidemiological studies. Carpenter stated such a search was a

generally accepted practice used by governmental agencies to decide whether to list an agent as capable of causing human disease. Carpenter conceded, however, that he discounted studies and data that showed no EMF-disease link when reaching his conclusions, especially newer studies. He also testified that he reached his conclusions about the health effects of EMF exposure using epidemiological studies alone and without considering toxicological studies.

Dr. Nancy Lee testified for PGE as an expert in epidemiology. Lee explained that epidemiology has protocols to ensure accurate and reliable results. Lee testified that David Carpenter had failed to comply with these protocols by failing to consider all the data relevant to a link between EMF exposure and illness and that his failure to do so violated generally accepted epidemiological practices. Lee testified that Carpenter had selectively ignored numerous studies that contradicted his conclusions, including the most recent studies about EMF exposure. Lee also noted that Carpenter had not only selectively ignored studies that disagreed with his conclusions, but he had even selectively ignored data within studies, creating a distorted view of the effects of EMF exposure. Lee testified that this approach also violated established epidemiological protocols. Lee insisted that the proper epidemiological methodology required consideration of the toxicological studies, which showed no correlation between EMF exposure and illness. Carpenter's methodology violated established epidemiological protocols.

The trial court ruled Carpenter's testimony inadmissible at the end of the *Frye* hearing. The trial court determined that Carpenter's theories lacked general acceptance in the scientific community and that he had failed to follow proper epidemiological methodology, rendering his conclusions unreliable. Consequently, the trial court excluded Carpenter's opinion under *Frye.*

The Supreme Court, in *Lakey v. Puget Sound Energy*, reversed the trial court's ruling excluding Dr. David Carpenter's testimony under *Frye*. In turn, PSE requested that high court to affirm the exclusion of Carpenter's testimony under ER 702. When granting PSE's *Frye* motion, the trial court found Carpenter's testimony unreliable and unhelpful to the jury.

The Supreme Court ruled that the trial court did not abuse its discretion when ruling Dr. Carpenter's opinion inadmissible under ER 702. Dr. Carpenter had failed to follow proper methodology. Dr. Carpenter did not consider all relevant data as basic epidemiology required. Dr. Carpenter discounted entire epidemiological and toxicological studies, especially the newer epidemiological studies. Dr. Carpenter failed to consider the later, better studies about the links between EMF and health harms, seriously tainting his conclusions because epidemiology is an iterative science relying on later studies to refine earlier studies in order to reach better and more accurate conclusions. Dr. Carpenter refused to account for the data from the toxicological studies, which epidemiological methodology requires unless the evidence for the link between exposure and disease is unequivocal and strong. Carpenter also selectively sampled data

within one of the studies he used, taking data indicating an EMF-illness link and ignoring the larger pool of data within the study that showed no such link. Carpenter's treatment of this data created an improper false impression about what the study actually showed.

I note that the Supreme Court affirmed the trial court on the basis that the court did not abuse her discretion when refusing to consider Dr. David Carpenter's opinions. The Supreme Court did not declare that the trial court would have abused her discretion if she had ruled conversely and permitted the testimony under ER 702. Since the ruling came in response to a CR 12(b)(6) motion, the Supreme Court likely breached its own rule that the court reviews evidentiary rulings, in response to summary judgment motions, de novo. Because the trial court relied on evidence other than the pleadings, the motion converted to a summary judgment motion under CR 56.

In *L.M. v. Hamilton*, 193 Wn.2d 113 (2019), a child, through his guardian ad litem, brought a negligence action against the midwife, who delivered him, for brachial plexus injury (BPI) that the child suffered at birth. The jury returned a verdict in favor of the midwife. On appeal, the child argued that the trial court abused its discretion when ruling that a biomechanical engineer's testimony regarding forces of childbirth would be helpful to the jury. The child based his contention on *Frye* and ER 702. The Court of Appeals and the Supreme Court affirmed.

On April 4, 2010, Laura Hamilton, a midwife, delivered L.M. Hamilton's notes from the procedure show that she performed an "assisted shoulder delivery" and that L.M.'s right arm was "weak at side." In his first few months of life, L.M. experienced

"complete paralysis" of his upper arm, along with weakness in the entire arm. In August 2010, exploratory surgery to address the problem revealed substantial injuries to L.M.'s brachial plexus. The brachial plexus delivers signals from the spinal cord to the arm through a network of nerves. These nerves can suffer various injuries, the most severe of which are avulsions where the nerve is torn from the spinal cord and ruptures where the nerve is ripped apart. Although most BPIs heal in six months, avulsions and ruptures are permanent.

L.M.'s BPI was likely permanent. All five of his brachial nerve roots were injured: two were ruptured, one was avulsed, and two were partially avulsed.

L.M. alleged that Laura Hamilton responded negligently to his shoulder dystocia, an emergency in which a baby's shoulder gets stuck during labor. L.M. claimed that Hamilton used excessive force, or traction, in her effort to free the shoulder. Hamilton responded that the injury resulted from the natural forces of labor (NFOL), for which she lacked responsibility.

L.M. relied on the testimony of Dr. Howard Mandel, an obstetrician-gynecologist, that an avulsion or rupture of brachial plexus nerve roots to an otherwise normal baby cannot occur from mere uterine contractions or maternal pushing. Dr. Mandel added that no medical studies or case reports support Laura Hamilton's contention. Dr. Mandel acknowledged that he had not studied nerve avulsion in over ten years. In forming his opinion, Mandel relied on his education, training, experience, and reading in bygone years. Dr. Stephen Glass, a pediatric neurologist, echoed Dr. Mandel's opinion.

Dr. Glass conceded a lack of scientific studies that measure the force needed to cause a brachial plexus.

Laura Hamilton argued that the NFOL theory follows generally accepted scientific methodologies, principles, and techniques that had been published in the medical and scientific literature over the last 25 years. She relied on a survey of medical literature by Dr. Robert DeMott, an obstetrician-gynecologist. That literature showed that NFOL can cause BPI, but it did not describe what types of BPI, including avulsion, or rupture, this included. The precise subcategory of permanent BPI can be determined only by surgical intervention, and not all children with permanent injury undergo surgery. Dr. DeMott insisted that the court should ask whether the current literature shows that NFOL causes permanent injuries, rather than asking whether the current literature shows that NFOL causes avulsions or ruptures. Dr. DeMott cited many recent studies showing NFOL may cause BPIs. One report, however, noted the need for further study.

The trial court first excluded Laura Hamilton's expert testimony under ER 702 because the theory of NFOL failed to explain how natural forces caused avulsions and ruptures. The trial court later reversed herself based on more expert testimony as to the consensus in the medical community that NFOL can cause BPI.

In *L.M. v. Hamilton*, the three levels of court also addressed whether Dr. Allan Tencer, a biomechanical engineer, should have been allowed to testify about the internal and external forces involved in childbirth. Dr. Tencer held a doctorate in mechanical engineering and taught orthopedics, sports medicine, and mechanical engineering at the

University of Washington. Dr. Tencer testified that, from a biomechanical forces perspective, an expert cannot determine whether the brachial plexus nerve damage suffered by L.M. resulted from NFOL or Hamilton's extraction of the baby from the wound. He reached this conclusion after reviewing the current science on the forces, including NFOL, at play.

L.M. criticized Dr. Tencer's testimony as speculative and misleading because Dr. Tencer misinterpreted and drew hasty generalizations from the underlying literature. According to L.M., Dr. Tencer testified regarding forces that his own published sources say are not possible. The trial court admitted Dr. Tencer's opinion under ER 702's requirement of admissibility. According to the trial court, L.M. could challenge Dr. Tencer's interpretation of the underlying literature through cross-examination.

L.M. argued that Allan Tencer used data inappropriately to reach a preordained conclusion. L.M. challenged Tencer's testimony regarding the force necessary to injure the brachial plexus because virtually all the medical literature states that this force is not known and cannot be known. The Supreme Court repeated the trial court's comment that any concerns over Dr. Tencer's use of the data and any literature would make excellent arguments for cross-examination. The Washington Supreme Court ruled that the trial court did not abuse her discretion.

In *Desranleau v. Hyland's, Inc.*, 26 Wn. App. 2d 418 (2023), 13-month-old Jay'Breon tragically died in his crib. In the days before his death, Jay'Breon caught a

cold. His caregiver gave him several medications, including Hyland's Baby Tiny Cold Tablets, a homeopathic cold remedy manufactured by Hyland's.

Jay'Breon's mother, Tanessa Desranleau, sued Hyland's, claiming that an ingredient in the cold tablets, Gelsemium sempervirens (GS), caused his death. Hyland's moved for summary judgment. The trial court, while applying *Frye v. United States*, ER 702, and ER 703, excluded the opinion of Desranleau's expert, pathologist Dr. Marvin Pietruszka, who opined that the Hyland's tablets consumed by Jay'Breon more likely than not caused his death. The court then dismissed Desranleau's lawsuit on summary judgment.

Hyland's deposed Marvin Pietruszka. Pietruszka testified that he employed his knowledge of toxicology to help explain Jay'Breon's death. Pietruszka testified that GS is a poisonous toxic chemical. The substance should not have been incorporated into a homeopathic medication prescribed to anyone, but most certainly not to infants. The nanoparticles of GS contain strychnine-type chemicals and injure cell function. Even minute quantities of GS were potentially fatal. He acknowledged, however, the sparsity of research studies that exist for herbal medicines, especially GS. Because of GS' toxicity, science had conducted no studies on humans. Dr. Pietruszka conceded that no one knows the toxic and lethal dose for GS. He insisted, however, that he did not need to know the unit of measurement at which GS becomes lethal in order to conclude that GS killed Jay'Breon. Dr. Pietruszka relied on the relationship between the science known about GS, its relationship to strychnine, and its effect on the nervous system from the

literature. The literature confirmed the direct toxicity of GS, even in small doses, on the central nervous system. He testified about the chemical passing through cell membranes and causing damage to cell structure. The chemical thereby attacked brain tissue.

Dr. Marvin Pietruszka further testified that he reviewed other possible causes of death. He reviewed the autopsy report and did not find any aspects of the autopsy to identify any medical condition that could have otherwise caused Jay'Breon's death. He believed that the biochemical nature of GS explained the baby's death.

Like Dr. Peter Gale, Marvin Pietruszka applied the *Hill viewpoints* for causation, a methodology of determining causation that involves analyzing nine criteria. Pietruszka testified that the *Hill viewpoints* was generally accepted in the medical field and described his analysis of each of these criteria. GS maintained a strong association to a toxic effect. Even a dose in the nano level could be dangerous. The literature consistently referred to GS as a poison. Biological plausibility and temporal causation existed. The autopsy helped to eliminate other factors. Another of Hyland's products, a teething drug that contained belladonna, had caused death of babies.

I highlight that Marvin Pietruszka's testimony relied on literature that, in general, considered GS a toxin. No literature specific to death in children or attack on brain tissue existed. Pietruszka noted that while one or two points could be argued, the *Hill viewpoints* did not require all nine criteria; a majority was sufficient to establish causation. Applying this methodology, Dr. Pietruszka concluded to a reasonable degree of medical certainty that causation for the death was the administration of GS.

54

Hyland's attacked the admissibility of Dr. Pietruszka's expert opinion both on the basis of *Frye* and ER 702. The trial court excluded the testimony, while stating no scientific theory confirmed that GS, at undetectable levels, could be lethal. Hyland's insisted the amount of GS in the tablets is undetectable and a safe amount. Dr. Pietruszka's opinion lacked a foundation necessary under ER 702. Pietruszka could not cite to any other expert or any published, peer-reviewed study that supported his position.

On appeal this court reversed both the trial court's decision under *Frye* and under ER 702. Dr. Pietruszka provided the factual basis for his opinions both in his initial declarations and in his deposition testimony. He referred to stratification, during the manufacturing process, in the cold tablet that could lead to a stronger dosage in some pills. The lack of information about the particular dose or dose response of GS did not render Dr. Pietruszka's opinion on causation speculative, particularly when he presented a plausible reason why dose response information did not exist. Dr. Pietruszka based his opinion on an article about medical treatments using certain nanoparticles to alter vital cell structures and on articles that read GS "is a known toxin." The cold tablet bottle label mentioned GS as an active ingredient. This data sufficed for Dr. Pietruszka to formulate his opinion even absent specific evidence of the quantity of GS that Jay'Breon ingested. Jurors could evaluate the foundation for the opinion on causation and determine the weight to give the testimony.

In *Erickson v. Pharmacia LLC*, 5 Wn.3d 585, 578 P.3d 306 (2025), former teachers brought action against the successor-in-interest of a company that had manufactured polychlorinated biphenyls (PCBs) contained in an old school building where the teachers once worked. The teachers alleged the PCBs damaged their health. On appeal, Pharmacia assigned error to the trial court's admission of the expert opinions of industrial hygienist Kevin Coghlan. Pharmacia attacked the reliability of Coghlan's use of a back-calculation method when opining that the teachers were likely exposed to injury-causing levels of PCBs during the time they taught at the school.

An industrial hygienist estimates a worker's exposure to chemical and physical agents in the workplace. When real-time measurements of exposure cannot be conducted, industrial hygienists attempt to estimate past exposure levels. The specific methods used depend on the available data and the intended use of the final estimation. Kevin Coghlan's back-calculation of PCBs using carpet samples relied on a concept known as "source-sink dynamics." Source-sink dynamics addresses how particles, including PCBs, migrate from an original source, such as light ballasts, to materials that absorb them, such as carpet, known as sinks. Some objects act as both a sink and a secondary source, re-emitting particles after they have been absorbed. Pharmacia conceded that light ballasts in the school emitted PCBs, that a carpet acts as a sink absorbing PCBs, and that air can function both as a sink and a secondary source of PCBs. Pharmacia agreed that mathematical models can be developed to describe the rate at which sources emit PCBs and sinks absorb PCBs under specific conditions. But,

Pharmacia challenged Coghlan's method of reversing these models to use PCB concentrations in carpet, a sink, to estimate past concentrations of PCBs in the air, a source. Pharmacia argued that industrial hygienists did not generally accept this reverse back-calculation.

In devising his method of calculation, Kevin Coghlan relied heavily on the work of an EPA study published in 2012 known as the Guo study. This study examined how common building materials, including two types of carpet, absorb PCBs from the air in a controlled laboratory environment. The experiment used two connected chambers. In the first chamber, PCB-containing caulk acted as a stable source of PCBs, emitting the chemicals into clean air pumped in from one side. Fans then directed this air to flow into the second chamber, where the air acted as a secondary source of PCBs to be absorbed by small buttons of each building material. Throughout the test, scientists monitored PCB concentrations in the outlet air and periodically removed the buttons of building material to test their PCB concentrations. The study calculated the partition coefficient for each material, representing the ratio between the PCB concentration in the material and the PCB concentration in the surrounding air at the end of the experiment. In a section describing the study's limits, the study noted the wide variety of building materials used in the real world and cautioned that care should be taken when applying the test results to seemingly similar materials in real-world situations.

Kevin Coghlan acquired samples of carpet from the school, which a former science teacher had collected in December 2015. The teacher collected the samples just

before the school's carpet was replaced and prior to the start of PCB remediation. She stored them in plastic sandwich bags inside brown paper bags in her basement from 2016 until January 2019, when she provided them to Coghlan.

Kevin Coghlan used the school carpet samples along with data from the Guo study to estimate past PCB concentrations in the air at the school. Coghlan first measured the PCB concentrations in each carpet sample. He divided his measured PCB concentrations by the PCB concentrations measured in the carpets in the Guo study, then multiplied by the known concentration of PCBs in the air from the Guo study. The result was the PCB concentration likely in the air at the school for the carpet samples to have absorbed the measured concentrations by the time the samples were collected, assuming the carpet was similar in absorbency to one of the carpets in the Guo study.

During cross-examination, Kevin Coghlan admitted that no one had ever used a carpet sample to back-calculate the historic concentration of PCBs in the air, nor had anyone published a peer-reviewed study involving that specific method. The Washington Supreme Court analyzed whether Kevin Coghlan's testimony met the demands of ER 702. The court deemed the method reliable. Coghlan had followed the method. The testimony helped the jury, whose members would lack knowledge of PCBs and how to measure the presence of PCBs in a room or building.

Pharmacia asserted that Kevin Coghlan's method was either not reliable or not reliably applied. The Supreme Court ruled Pharmacia's arguments went to the weight, not admissibility, of the testimony. Pharmacia underscored the Guo study's cautionary

statement that "care should be taken when applying the test results to seemingly similar materials in real-world situations." Nevertheless, Coghlan acknowledged the assumptions underlying his methods, including that all PCBs in the carpet samples were absorbed from the air, despite the presence of other potential sources at the school. To address this, he excluded from his calculations one carpet sample that had clear evidence of direct exposure to ballast oil, and he noted that the high PCB concentrations of two other samples may have reflected tracking of PCBs on to the carpet rather than only absorption from the air.

The recent decision in *Garner v. BNSF Ry. Co.*, 98 Cal. App. 5th 660, 316 Cal. Rptr. 3d 862 (Cal. Ct. App. 2024) may correspond closer than any other reported decision to a pending appeal. A son, Gary Garner (Gary), brought a wrongful death action under FELA against BNSF, his father's former employer. The son alleged that his father's occupational exposure to toxic levels of diesel exhaust, benzene, rock dust from railroad track ballast, asbestos fibers, and creosote, during four decades as trainman for the railroad, was a cause of the father's development of non-Hodgkin's lymphoma after his retirement. The trial court granted BNSF's motion in limine to exclude opinions of the son's experts on liability and causation. The trial court concluded that the experts relied on inadequate science. Too great an analytical gap lay between the data and their opinions. The California Court of Appeals reversed.

BNSF's expert, Dr. Peter Shields, claimed he reviewed of all the available medical literature. Dr. Shields opined that none of the substances identified in Gary Garner's

complaint had been causally linked to the development of non-Hodgkin's lymphoma.

Gary relied on expert witnesses, Dr. Andrew Salmon, Dr. Joseph Landolph and Dr. Peter

Gale, who each opined that the substances can cause non-Hodgkin's lymphoma and more

probably than not caused Melvin Garner's (Melvin) non-Hodgkin's lymphoma. Gary

also relied on Dr. Paul Rosenfeld, who opined that, while working for BNSF, Melvin was

exposed to significant levels of diesel exhaust and its constituents that substantially

increased his risk of developing non-Hodgkin's lymphoma.

One of BNSF's motions in limine number moved to exclude Dr. Andrew

Salmon's opinions that (1) Melvin's exposure to diesel exhaust during his work at BNSF

substantially increased his risk of developing non-Hodgkin's lymphoma; and (2)

Melvin's exposure to diesel exhaust during his work at BNSF was more likely than not a

cause of his lymphoma. BNSF argued that Dr. Andrew Salmon had no evidence linking

exposure to diesel exhaust with non-Hodgkin's lymphoma. BNSF asserted that Salmon

improperly relied on evidence suggesting a link between diesel exhaust and lung cancer

to extrapolate and form his opinion that exposure to diesel exhaust must therefore also be

linked to other kinds of cancer, including non-Hodgkin's lymphoma. Dr. Salmon

concluded that Melvin's additional risk of cancer which he experienced as a result of

work exposures was between 2,864 and 3,875 excess cancers per million people. He

did not confine this prediction to non-Hodgkin's lymphoma or to any site of a tumor

formation. At deposition, Dr. Salmon described his methodology by stating that the risk

estimate is designed to provide an estimate as the overall risk of cancer and it does not

specify that that risk be confined exclusively to the lung cancer site or other specific sites that have been measured and considered in the risk assessment. According to BNSF, because Dr. Salmon could not limit the excess cancer risk to non-Hodgkin's lymphoma, his opinions were not specific to Melvin and thus pure speculation.

In response, Gary Garner emphasized the lack of literature requiring a methodology focused solely on the cancer site at issue. Gary argued that Dr. Andrew Salmon had explained in his report and at deposition why an excess cancer risk calculation can properly be based on a method looking at any organ site rather than focusing on the organ site at issue. According to Dr. Salmon, the California Environmental Protection Agency adopted this method of determining cancer risks. Diesel exhaust directly acts on DNA in cells and this is true no matter in what tissue or organ the cells lie. Gary argued that Dr. Salmon need not identify a study conclusively finding that non-Hodgkin's lymphoma is caused by diesel exhaust. Epidemiological literature only established statistical *associations* between agents and various diseases. The studies did not provide conclusions regarding whether a particular agent *causes* a particular disease.

Another of BNSF's motions in limine moved to exclude Dr. Peter Gale's opinions that: (1) diesel exhaust and its particulates benzene, dioxin, and formaldehyde are a cause of non-Hodgkin's lymphoma in humans; and (2) more likely than not, the exhaust was a cause of his non-Hodgkin's lymphoma. BNSF highlighted that, although Dr. Gale acknowledged that a "dose" is necessary to calculate an excess cancer rate, he did not and

could not give an opinion regarding the dose necessary to cause non-Hodgkin's lymphoma. According to BNSF, this rendered Dr. Gale's opinions speculative.

Gary Garner argued that BNSF's demand for a specific number reflecting the minimum dose necessary to causally connect diesel exhaust exposure with non-Hodgkin's lymphoma was neither scientifically sound nor legally required. Gary mentioned that his experts actually presented a specific dose, between 2864 and 3875 excess cancers per million persons exposed to that dose, a number more than trivial, through the excess cancer risk calculation performed by Dr. Salmon, on which Dr. Gale relied to support his causation opinion. Gary again emphasized that diesel exhaust and its constituents are mutagenic, multiorgan carcinogens, meaning that analysis of cancer at one organ site is relevant to analysis of cancers at other sites.

The trial court granted BNSF's motions in limine. The court emphasized that no study specifically linked non-Hodgkin's lymphoma with exposure to diesel exhaust. Thus, the experts lacked sufficient data, studies, and literature to draw their conclusions. The trial court's ruling prompted dismissal of the suit.

On appeal, the parties wrestled over whether the appellate court should apply an abuse of discretion standard or afford Gary Garner de novo review. The court opted the latter standard of review. Under California law, the reviewing court generally reviews for abuse of discretion evidentiary rulings including orders in limine at trial. Nevertheless, a de novo standard applied when the granting of a motion in limine resulted

in the dismissal of the cause of action or the entire case before trial. The rulings deprived Gary Garner of essential evidence of causation.

The California Court of Appeals reviewed evidence rules similar, if not identical, to Washington's ER 701 and 702. The court acknowledge that the trial court possessed authority to exclude an opinion with a great analytical gap between the data and the opinion proffered. Under the evidence rules, the trial court acts as a gatekeeper to unreliable evidence.

The California reviewing court noted the impressive qualifications of Dr. Andrew Salmon and Dr. Peter Gale. Dr. Salmon had fifty-years of experience analyzing the carcinogenic effect of toxic exposure in humans, including thirty-one years working for the California EPA. When calculating Melvin's excess cancer risk, Dr. Salmon relied on Melvin's specific exposure information, air sampling data, air modeling studies involving railway workers, and the diesel particulate matter inhalation cancer potency factor developed by the state EPA. Thus, he employed standard methodology. The court ruled that an expert could testify to the cause of a cancer despite the lack of a study linking diesel engine exhaust to the type of cancer suffered by the worker.

The California court discussed the unique features of cases involving toxic exposures and cancer. Epidemiology focuses on the question of general causation. It cannot prove causation; rather, causation is a judgment for epidemiologists and others interpreting the epidemiologic data. Epidemiological studies merely identify *associations*, which do not equate to causation. An expert must bridge the gap between

association and causation and make that informed judgment. Whether an inference of causation based on an association is appropriate is a matter of informed judgment, not scientific methodology. RESTATEMENT (THIRD) OF TORTS, § 28, com. (c), subd. (3), p. 406 (Am. Law Inst. 2010). In the end, deciding whether associations are causal typically is not a matter of statistics alone, but also rests on scientific judgment. And scientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention. In applying the scientific method, scientists do not review each scientific study individually for whether by itself it reliably supports the causal claim being advocated or opposed. Gary Garner's experts could use their experience and judgment to interpret the available epidemiological and other data they reviewed in reaching their causation opinions.

Dr. Andrew Salmon explained that, for chemicals that induce tumors at multiple sites, the single-site approach may underestimate the true carcinogenic potential. Therefore, his statistical procedure should be allowed to estimate an overall potency. Science recognizes that diesel exhaust and many of its chemical constituents act directly on DNA, causing mutations. Diesel exhaust is a mutagenic, multi-organ carcinogen, which consists of many mutagenic multi-organ carcinogens. The occurrence of tumors in one site is relevant to development of tumors in other sites.

BNSF highlighted that IARC Monograph 105 did not list non-Hodgkin's lymphoma among the types of cancer that diesel exhaust has been demonstrated to cause. Instead, the monograph focused on lung cancer. The California court noted that the

64

monograph did not refute a connection between the lymphoma and diesel engine exhaust.
Regardless, an expert may rely on his knowledge even if a study contradicts this
knowledge.

The California Court of Appeals applied the same analysis to the trial court's
exclusion of Dr. Peter Gale's opinion. The reviewing court first noted Dr. Gale's
background in hematology and oncology with substantial experience in statistics and
epidemiology. Dr. Gale had published over 1,200 scientific articles and more than 20
books, mostly on leukemia, transplantation, cancer biology, immunology, and radiation
biology. Dr. Gale concluded that Melvin's occupational exposure to diesel engine
exhaust and its constituents, including but not limited to benzene, dioxin, and
formaldehyde, were, to a reasonable degree of medical probability, a cause of Melvin's
non-Hodgkin's lymphoma. Using the weight-of-the-evidence methodology, Dr. Gale
concluded that diesel exhaust and its particulates cause cancer in humans, that they are a
cause of non-Hodgkin's lymphoma in humans. Dr. Gale's inability to identify a
particular study supporting his conclusion and Dr. Gale's inability to identify a particular
dose level at which exposure causes cancer did not impeach his opinions such that they
became inadmissible. Because the court concluded that the Dr. Gale's general causation
opinions were admissible, Dr. Gale could properly base his specific causation on those
opinions. Dr. Gale could extrapolate from evidence that diesel engine exhaust causes
cancer in one organ to the exhaust causing cancer in other sections of the human body.

The well-reasoned opinion in *Garner v. BNSF Ry. Co.* alone should compel a reversal of Judy Cundy's trial court and admission of the opinions of Dr. Peter Gale. Nevertheless, I now apply ER 702 and decisions issued under the evidence rule to determine if, for purposes of summary judgment, Dr. Peter Gale's opinions should be excluded.

At the outset, I list reasons asserted by BNSF or given by the trial court to prohibit the testimony as unreliable. Many of the reasons overlap. I recognize that some of the reasons on their own were not necessarily used by the trial court to reject Dr. Gale's opinions.

1. Dr. Gale initially opined that asbestos was a cause of colorectal cancer but has not retracted this opinion while all other plaintiff experts have.

2. Dr. Gale performed no independent research for his opinions in this case.

3. Dr. Gale found no medical literature that states that diesel engine exhaust can cause all forms of cancer.

4. Dr. Gale found no medical literature that states colorectal cancer or cygnet cell type adenocarcinoma in the colon can be caused by diesel engine exhaust.

5. Sixteen studies examined the exposure to diesel exhaust and colorectal cancer and only one study found a statistically significant association.

6. According to BNSF expert, Douglas Weed, the one study that shows diesel engine exhaust to cause colorectal cancer employed a 90 percent confidence level instead of the more common 95 percent confidence interval.

7. Douglas Weed identified eleven studies involving colon, colorectal, or rectal cancer, published between 1977-2019, unmentioned by Dr. Gale in the latter's report.

8. Dr. Gale uses ellipsis in paragraph 6.3 of his report to "intentionally misrepresent" the content of IARC Monograph Volume 105.

9. Dr. Gale fails to discuss the study or studies he cites to support his conclusions of general causation and specific causation.

10. Dr. Gale fails to discuss other details found in the same studies that do not stand for the proposition for which they are cited.

11. Research studies show a link between tobacco and colorectal cancer.

12. Dr. Gale only relies on his general knowledge when asserting a lack of connection between tobacco and signet cell adenocarcinoma.

13. Dr. Gale could not cite to any study that excludes tobacco smoke as a cause of colon cancer.

14. Dr. Gale could point to no study that establish that tobacco did not cause Judy Cundy's cancer because of the rareness of her form of cancer.

15. While Dr. Gale contends that diesel engine exhaust can cause all forms of cancer, he denies that tobacco can cause all forms of cancer, including colorectal cancer.

16. Dr. Gale fails to explain how diesel engine exhaust, which some studies show to be unrelated to colon cancer, caused Judy Cundy's cancer, when smoking, which is an established cause of colon cancer, did not cause her cancer.

17. Dr. Gale failed to systematically review all available data such that he neither followed the weight-of-evidence methodology not Bayesian methodology.

18. Dr. Gale did not use the methodology of differential diagnosis contrary to his claim.

19. One cannot determine the methodology, if any, employed by Dr. Gale when reaching his opinion.

20. Dr. Gale states he relies on Bayesian probabilities but he fails to calculate a predictive value based on Bayes' theorem.

21. Dr. Peter Gale's approach is we can't rule this out, so we will rule this in.

22. Two other courts have stricken testimony of Dr. Peter Gale. *Finestone v. Florida Power*, 2006 U.S.Dist. LEXIS 7743 *53-57 (S.D. Fla. 2006), *aff'd* 272 Fed. Appx. 761 (11th Cir. 2008); *Wilcox v. Homestake Mining Co.*, 2008 U.S. Dist. LEXIS 110321*15 (D.N.M. 2008).

I recognize *Lakey v. Puget Sound Energy* to harm the legal position of Judy Cundy. Experts Be Kun Li and David Carpenter engaged in a similar methodology as did Dr. Peter Gale in the present case. But the overwhelming case law, including Washington Supreme Court decisions, demands the introduction of Dr. Peter Gale's opinions.

Some of the attacks on Dr. Peter Gale's opinion regarding exposure to diesel engine exhaust causing colorectal cancer challenge his credibility or honesty. A court does not weigh the credibility of witnesses in a summary judgment proceeding. *Haley v.*

*Amazon.com Services, LLC*, 25 Wn. App. 2d 207, 217, 522 P.3d 80 (2022). These attacks include emphasis that Dr. Gale continues to opine that asbestos also caused the cancer, his purported intentional misleading of the court by editing IARC Monograph 105, his seemingly inconsistent handling of literature on tobacco being a cause and formaldehyde being a cause, and the exclusion of his testimony in other cases. *Haley v. Amazon.com Services, LLC*, 25 Wn. App. 2d 207, 217, 522 P.3d 80 (2022). An expert may be wrong in one opinion and correct in another opinion. The jury decides this.

BNSF and the majority fail to recognize basic science that supports the testimony of Dr. Peter Gale. Diesel engine exhaust attacks the inside of human cells. Science confirms that mutagenic agents like diesel particulates increase the risk of cancer irrespective of specific organ sites. This phenomenon occurs regardless of whether the exhaust reaches the victim's lungs, his colon, or his rectum. IARC Monograph establishes without question that diesel engine exhaust causes cancer in some organs. Under *Anderson v. Akzo Nobel Anderson Coatings, Inc.*, the expert may use pure science for his opinion.

Both *Anderson v. BNSF Railway* and *Desranleau v. Hyland's* involve poisons attacking the inside of a cell. The courts excused the experts from linking the toxin to the particular organ where the plaintiff contracted cancer.

Dr. Peter Gale's reliance on his knowledge of this basic science alone qualifies him to testify as to diesel engine exhaust being a cause of Judy Cundy's colorectal cancer. He need not rely on any particularly methodology to reach this opinion. Dr. Gale

69

need not cite to any literature to support this opinion. Marvin Pietruszka, in *Desranleau v. Hyland's*, could not cite to any other expert or any published, peer-reviewed study that supported his position. *Harbin v. Burlington Northern Railroad* stands for the proposition that the expert need not have measurements of the toxin. *Reese v. Stroh* holds that the expert need not base causation on statistics. In *Hines v. Consolidated Rail Corp.*, the court permitted Harry Shubin to testify that work exposures caused Oscar Hines' malady simply by reviewing Hines' histories of exposures to toxins and scientific literature that indicates that PCBs can be associated with severe health problems.

In *Rubanick v. Witco Chemical Corp.*, the New Jersey relied in part on the extensive qualifications of Dr. Earl Balis. The court stated that the qualifications of the expert proffering relatively new scientific knowledge must be factored into the determination of the soundness of the methodology used. Dr. Peter Gale's qualifications are as strong as one may ever see for a science expert.

Dr. Gale conducted a comprehensive analysis based on decades of scientific literature, epidemiological studies, and data related to the carcinogenic effects of diesel particulate matter. His methodology included an assessment of Judy Cundy's exposure, estimated dose, and excess cancer risk similar to the methodology used by the expert in *Anderson v. Akzo Nobel Anderson Coatings, Inc*. Dr. Gale cited to IARC Monograph 105 that indicates studies show diesel engine exhaust can cause cancer in lungs and even in the colon. Dr. Gale also cited IARC Monograph 88F and the United States EPA IRIS

Report on Formaldehyde for articles related to risks of colorectal cancer in persons occupationally expose to formaldehyde, a constituent of diesel exhaust.

Dr. Peter Gale considered potential alternative causes, including tobacco and ruled out these alternatives. BNSF presented no evidence that cigarette smoking can contribute to Judy Cundy unique form of colorectal cancer.

Dr. Douglas Weed criticized Dr. Andrew Salmon's analysis as being based on methods used by regulatory agencies. Drs. Salmon and Gale, in the present case, employed the California EPA risk assessment model. Other courts rely on scientific methods adopted by government agencies. Dr. Salmon used his experience and methods learned at the California EPA when rendering opinions in *Garner v. BNSF Ry. Co.*

In the trial court's letter ruling, the court correctly identified two unreported decisions, in which the courts excluded Dr. Peter Gale's opinions. But having one's opinions excluded in one case does not preclude one from rendering admissible opinions in another case.

When listing the two decisions in its ruling, the trial court failed to perform a weight-of-the-evidence analysis of Dr. Peter Gale's decisions. Other courts have also excluded testimony from Dr. Peter Gale. *In re Incretin-Based Therapies Products Liability Litigation*, 21-55342, 2022 WL 898595, at *2 (9th Cir. 2022); *Hernandez v. Union Pacific Railroad Co.*, 8:18CV62, 2020 WL 4732068, at *9 (D. Neb. 2020); *Byrd v. Union Pacific Railroad Co.*, 453 F. Supp. 3d 1260, 1273 (D. Neb. 2020). Nevertheless, many courts have rejected attempts to bar Dr. Gale's opinions or have accepted the expert

opinions of Dr. Peter Gale. *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014); *June v. Union Carbide Corp.*, 577 F.3d 1234 (10th Cir. 2009); *Friedman v. Central Maine Power Co.*, 2:20-CV-00237-JDL, 2024 WL 1327344, at *7 (D. Me. 2024); *Zervos v. Verizon New York, Inc.*, 01 CIV 685(GBD), 2001 WL 1262941, at *2 (S.D.N.Y. Oct. 22, 2001), *rev'd,* 277 F.3d 635 (2d Cir. 2002); *Zervos v. Verizon New York, Inc.*, 01 CIV. 685(GBD), 2001 WL 253377, at *8 (S.D.N.Y. 2001), *aff'd,* 252 F.3d 163 (2d Cir. 2001); *Garner v. BNSF Railway Co.*, 98 Cal. App. 5th 660, 316 Cal. Rptr. 3d 862 (Cal. Ct. App. 2024). The best reasoned decision, *Garner v. BNSF Railway Co.*, reversed the trial court for dismissing Dr. Peter Gale's opinion.

The majority's opinion expresses the unstated concern about what one commentator calls "the hired gun phenomenon." Weinstein, *Improving Expert Testimony,* 20 *U.Rich.L.Rev.* 473, 482 (1986). An expert can be found to testify to the truth of almost any factual theory, no matter how frivolous. Weinstein, *Improving Expert Testimony,* 20 *U.Rich.L.Rev.* 473, 482 (1986). Juries can be misled by highly paid experts who will find at least some support in the voluminous scientific literature for any position, even when that position is repudiated by the majority of scientists. Brennan, *Helping Courts with Toxic Torts: Some Proposals Regarding Alternative Methods for Presenting And Assessing Scientific Evidence in Common Law Courts*, 51 *U.Pitt.L.Rev.* 1, 4 (1989). In *Bowers v. Norfolk Southern Corp.*, 537 F. Supp. 2d 1343 (M.D. Ga. 2007), *aff'd,* 300 Fed. Appx. 700 (11th Cir. 2008), a federal judge, while attempting to prove his intelligence, addressed the hired gun phenomenon. The former defense lawyer

judge took revenge on plaintiffs and the plaintiff's bar when ruling expert testimony inadmissible with a devastating critique of the expert as a hired gun.

The hired gun phenomenon works both ways, however. Well-funded corporations can afford to hire expensive and prestigious experts who will find error in even the best epidemiological studies and discount any adverse evidence. *Rubanick v. Witco Chemical Corp.*, 125 N.J. 421, 453, 593 A.2d 733, 749 (1991). Industries employ substantial sums to present ersatz scientific studies when denying that industry practices cause harm. History teaches of tobacco companies paying experts huge sums to deny that tobacco causes cancer. Brownell, Kelly D., and Warner, Kenneth E., *The Perils of Ignoring History: Big Tobacco Played Dirty and Millions Died. How Similar Is Big Food?* The Milbank Quarterly, March 2009, https://pmc.ncbi.nlm.nih.gov › articles, last accessed March 3, 2026. Currently, global conglomerates, such as ExxonMobil, pay millions to scientists who deny human activity as a cause of global warming. *ExxonMobil's Funding of Climate Science Denial* DeSmog International, October 24, 2023, https://www.desmog.com>exxonmobil-funding-climate-science-denial, last accessed on March 3, 2026; Charlotte Taylor, *Defense, Denial, and Disinformation: Uncovering the Oil Industry's Early Knowledge of Climate Change*, Georgetown University: The Earth Commons, October 25, 2023, last accessed on March 3, 2026.

Dr. Peter Gale does not follow a pattern of a hired gun. Dr. Gale holds a genuine concern for human suffering resulting from toxic chemicals and nuclear radiation. Throughout his lifetime, Dr. Gale has employed his extensive scientific knowledge to

assist those injured by such phenomena. But my role is not to judge Dr. Gale's motives or credibility. The jury should determine if Dr. Gale fits the role of one who formulates unsubstantiated medical opinions. BNSF's expert, Dr. Doulgas Weed, could just as easily be considered a hired gun.

The answer to the problem of hired guns should not entail the adherence to a standard of admissibility that will automatically foreclose reliable and credible expert evidence that can assist a finder of fact. Rather, the response should consist of greater judicial vigilance in scrutinizing the status of the expert and in directing the factfinder to those factors that bear relevantly on the expert's credibility.

A motion in limine at trial differs from a motion to exclude expert testimony in opposition to a summary judgment. BNSF retains the right to challenge Dr. Peter Gale's testimony through a trial motion in limine. Our review of such a ruling would come under an abuse of discretion standard.

I compliment the trial court for spending significant time analyzing the scientific evidence presented by both sides. Some judges might deny a summary judgment motion simply because of the complexity of the case and the glut and length of pleadings.

_Fearing, J.P.T._
Fearing, J.P.T.